1
2
3
4
5
6
7          UNITED STATES DISTRICT COURT, WESTERN DISTRICT OF WASHINGTON
                                    AT SEATTLE
8
9    AMBER RAINEY, CHRISTINA
     KOLLMEYER, and LISA VOGEL,
10                                                    No.
                              Plaintiffs,
11                                                    COMPLAINT
          v.
12
     MYLAN SPECIALTY, L.P., a Delaware
13   limited partnership,
14                            Defendant.
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COMPLAINT
Case No.



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ..............................................................................................1

II.    PARTIES ..........................................................................................................7

       A.     Plaintiffs ...............................................................................................7

       B.     Defendant .............................................................................................8

III.   JURISDICTION AND VENUE ......................................................................8

IV.    DRUG PRICING IN THE UNITED STATES ...............................................9

       A.     The Entities Involved in Drug Pricing .................................................9

       B.     Different Prices for Different Players .................................................10

       C.     Consumer Drug Costs .........................................................................12

       D.     PBMs Make Money by Manipulating Cost-Saving Incentives ............20

V.     EPIPEN ..........................................................................................................22

       A.     Food Allergies ....................................................................................22

       B.     The Growth in the Market for Auto-Injectors....................................22

              1.     Mylan did not develop the EpiPen, but bought the rights to
                     market and distribute the drug. ..............................................22

              2.     No EpiPen competitor has gained a toehold in the auto-injector
                     market. ...................................................................................25

                     a.     Twinject/Adrenaclick.................................................26

                     b.     Auvi-Q ......................................................................27

                     c.     Despite competition for EpiPen, list prices for auto-
                            injectors have risen sharply.......................................27

       C.     The Real Reason for EpiPen's Increasing List Prices ........................29

       D.     The Impact of Mylan's Artificial Pricing ..........................................31

VI.    TOLLING OF THE STATUTE OF LIMITATIONS .....................................33

       A.     Discovery Rule Tolling .......................................................................33

       B.     Fraudulent Concealment Tolling ........................................................34

       C.     Estoppel...............................................................................................34

COMPLAINT - i
Case No.

010648.11  949197 V1

HB  HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

VII.    CLASS ACTION ALLEGATIONS ..................................................................34

VIII.   CLAIMS FOR RELIEF ..............................................................................38

COUNT ONE  VIOLATION OF THE RACKETEER INFLUENCED AND
    CORRUPT ORGANIZATIONS ACT ("RICO"), 18 U.S.C. § 1961, *ET SEQ.* ..............38

        A.    The EpiPen Pricing Enterprise ..............................................................38

        B.    Conduct of the EpiPen Pricing Enterprise ..............................................43

        C.    Mylan's Pattern of Racketeering Activity ..............................................44

        D.    Mylan's Use of the U.S. Mail and Interstate Wire Facilities ...............46

        E.    Damages Caused by Mylan's EpiPen Pricing Fraud ...........................48

COUNT TWO  VIOLATION OF THE NEW JERSEY  CONSUMER FRAUD ACT
    AGAINST MYLAN  (N.J. STAT. ANN. § 56:8-1, *ET SEQ.*) ............................49

COUNT THREE  VIOLATION OF THE ALABAMA DECEPTIVE TRADE
    PRACTICES ACT  (ALA. CODE § 8-19-1, *ET SEQ.*) ................................49

COUNT FOUR  VIOLATION OF THE ALASKA UNFAIR TRADE PRACTICES
    AND CONSUMER PROTECTION ACT  (ALASKA STAT. ANN. §
    45.50.471, *ET SEQ.*) ..............................................................................51

COUNT FIVE  VIOLATION OF THE ARIZONA CONSUMER FRAUD ACT
    (ARIZONA REV. STAT. § 44-1521, *ET SEQ.*) .........................................52

COUNT SIX  VIOLATION OF THE ARKANSAS DECEPTIVE TRADE
    PRACTICES ACT  (ARK. CODE ANN. § 4-88-101 *ET SEQ.*) ...................53

COUNT SEVEN  VIOLATION OF THE CALIFORNIA LEGAL REMEDIES ACT
    (CAL. CIV. CODE § 1750, *ET SEQ.*) ........................................................54

COUNT EIGHT  VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION
    LAW  (CAL. BUS. & PROF. CODE § 17200, *ET SEQ.*) .............................55

COUNT NINE  VIOLATION OF THE COLORADO CONSUMER PROTECTION
    ACT  (COLO. REV. STAT. § 6-1-101, *ET SEQ.*) .......................................56

COUNT TEN  VIOLATION OF THE CONNECTICUT UNFAIR TRADE
    PRACTICES ACT  (CONN. GEN. STAT. § 42-110A, *ET SEQ.*) ..................57

COUNT ELEVEN  VIOLATION OF THE DELAWARE CONSUMER FRAUD
    ACT  (DEL. CODE TIT. 6, § 2513, *ET SEQ.*) ...........................................58

COUNT TWELVE  VIOLATION OF THE D.C. CONSUMER PROTECTION
    PROCEDURES ACT  (D.C. CODE § 28-3901, *ET SEQ.*) ...........................59

COUNT THIRTEEN  VIOLATION OF THE FLORIDA UNFAIR AND
    DECEPTIVE TRADE PRACTICES ACT  (FLA. STAT. § 501.201, *ET SEQ.*) .............60

COUNT FOURTEEN  VIOLATION OF THE GEORGIA FAIR BUSINESS

COMPLAINT - ii
Case No.

HB  HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

PRACTICES ACT  (GA. CODE ANN. § 10-1-390, *ET SEQ.*) ........................................60

COUNT FIFTEEN  VIOLATION OF THE GEORGIA UNIFORM DECEPTIVE
TRADE PRACTICES ACT  (GA. CODE. ANN § 10-1-370, *ET SEQ.*)..........................61

COUNT SIXTEEN  VIOLATION OF THE HAWAII ACT § 480-2(A)  (HAW.
REV. STAT. § 480, *ET SEQ.*) ...............................................................................61

COUNT SEVENTEEN  VIOLATION OF THE IDAHO CONSUMER
PROTECTION ACT  (IDAHO CODE ANN. § 48-601, *ET SEQ.*) .................................62

COUNT EIGHTEEN  VIOLATION OF THE ILLINOIS CONSUMER FRAUD
AND DECEPTIVE BUSINESS PRACTICES ACT  (815 ILL. COMP. STAT.
§ 505/1, *ET SEQ*. AND 720 ILL. COMP. STAT. § 295/1A).............................63

COUNT NINETEEN  VIOLATION OF THE INDIANA DECEPTIVE CONSUMER
SALES ACT  (IND. CODE § 24-5-0.5-3)..........................................................64

COUNT TWENTY  VIOLATION OF THE IOWA PRIVATE RIGHT OF ACTION
FOR CONSUMER FRAUDS ACT  (IOWA CODE § 714H.1, *ET SEQ.*) ......................65

COUNT TWENTY-ONE  VIOLATION OF THE KANSAS CONSUMER
PROTECTION ACT  (KAN. STAT. ANN. § 50-623, *ET SEQ.*) ................................66

COUNT TWENTY-TWO  VIOLATION OF THE KENTUCKY CONSUMER
PROTECTION ACT  (KY. REV. STAT. ANN. § 367.110, *ET SEQ.*)............................67

COUNT TWENTY-THREE  VIOLATION OF THE LOUISIANA UNFAIR TRADE
PRACTICES  AND CONSUMER PROTECTION LAW  (LA. REV. STAT.
ANN. § 51:1401, *ET SEQ.*) ................................................................68

COUNT TWENTY-FOUR  VIOLATION OF THE MAINE UNFAIR TRADE
PRACTICES ACT  (ME. REV. STAT. ANN. TIT. 5, § 205-A, *ET SEQ.*) ....................68

COUNT TWENTY-FIVE  VIOLATION OF THE MARYLAND CONSUMER
PROTECTION ACT  (MD. CODE, COM. LAW § 13-101, *ET SEQ.*)...........................69

COUNT TWENTY-SIX  VIOLATION OF THE MASSACHUSETTS GENERAL
LAW CHAPTER 93(A)  (MASS. GEN. LAWS CH. 93A, § 1, *ET SEQ.*) .....................70

COUNT TWENTY-SEVEN  VIOLATION OF THE MICHIGAN CONSUMER
PROTECTION ACT  (MICH. COMP. LAWS § 445.903, *ET SEQ.*)............................71

COUNT TWENTY-EIGHT  VIOLATION OF THE MINNESOTA PREVENTION
OF CONSUMER FRAUD ACT  (MINN. STAT. § 325F.68, *ET SEQ.*) ........................72

COUNT TWENTY-NINE  VIOLATION OF THE MINNESOTA DECEPTIVE
TRADE PRACTICES ACT  (MINN. STAT. § 325D.43-48, *ET SEQ.*) ..........................73

COUNT THIRTY   VIOLATION OF THE MISSISSIPPI CONSUMER
PROTECTION ACT  (MISS. CODE. ANN. § 75-24-1, *ET SEQ.*) ................................73

COUNT THIRTY-ONE  VIOLATION OF THE MISSOURI MERCHANDISING
PRACTICES ACT  (MO. REV. STAT. § 407.010, *ET SEQ.*)............................74

COMPLAINT - iii
Case No.

HB  HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

COUNT THIRTY-TWO  VIOLATION OF THE MONTANA UNFAIR TRADE
        PRACTICES  AND CONSUMER PROTECTION ACT OF 1973  (MONT.
        CODE ANN. § 30-14-101, *ET SEQ.*) .................................................................75

COUNT THIRTY-THREE  VIOLATION OF THE NEBRASKA CONSUMER
        PROTECTION ACT  (NEB. REV. STAT. § 59-1601, *ET SEQ.*)....................................76

COUNT THIRTY-FOUR  VIOLATION OF THE NEVADA DECEPTIVE TRADE
        PRACTICES ACT  (NEV. REV. STAT. § 598.0903, *ET SEQ.*) .....................................76

COUNT THIRTY-FIVE  VIOLATION OF THE NEW HAMPSHIRE  CONSUMER
        PROTECTION ACT  (N.H. REV. STAT. ANN. § 358-A:1, *ET SEQ.*) ..........................77

COUNT THIRTY-SIX  VIOLATION OF THE NEW JERSEY CONSUMER
        FRAUD ACT  (N.J. STAT. ANN. § 56:8-1, *ET SEQ.*)........................................78

COUNT THIRTY-SEVEN  VIOLATION OF THE NEW MEXICO UNFAIR
        TRADE PRACTICES ACT  (N.M. STAT. ANN. §§ 57-12-1, *ET SEQ.*) ......................79

COUNT THIRTY-EIGHT  VIOLATION OF THE NEW YORK GENERAL
        BUSINESS LAW §§ 349-350  (N.Y. GEN. BUS. LAW §§ 349-350) ...........................79

COUNT THIRTY-NINE  VIOLATION OF THE NORTH CAROLINA UNFAIR
        AND  DECEPTIVE ACTS AND PRACTICES ACT  (N.C. GEN. STAT. §
        75-1.1, *ET SEQ.*) ..........................................................................80

COUNT FORTY  VIOLATION OF THE NORTH DAKOTA CONSUMER FRAUD
        ACT  (N.D. CENT. CODE § 51-15-02) ................................................81

COUNT FORTY-ONE  VIOLATION OF THE OHIO CONSUMER SALES
        PRACTICES ACT  (OHIO REV. CODE ANN. § 1345.01, *ET SEQ.*)............................82

COUNT FORTY-TWO  VIOLATION OF THE OKLAHOMA CONSUMER
        PROTECTION ACT  (OKLA. STAT. TIT. 15, § 751, *ET SEQ.*)................................82

COUNT FORTY-THREE  VIOLATION OF THE OREGON UNLAWFUL TRADE
        PRACTICES ACT  (OR. REV. STAT. §§ 646.605, *ET SEQ.*)................................84

COUNT FORTY-FOUR  VIOLATION OF THE PENNSYLVANIA UNFAIR
        TRADE PRACTICES  AND CONSUMER PROTECTION LAW  (73 PA.
        CONS. STAT. § 201-1, *ET SEQ.*) ................................................85

COUNT FORTY-FIVE  VIOLATION OF THE RHODE ISLAND UNFAIR TRADE
        PRACTICES  AND CONSUMER PROTECTION ACT  (R.I. GEN. LAWS §
        6-13.1, *ET SEQ.*)..............................................................86

COUNT FORTY-SIX  VIOLATION OF THE SOUTH CAROLINA UNFAIR
        TRADE PRACTICES ACT  (S.C. CODE ANN. § 39-5-10, *ET SEQ.*)...........................87

COUNT FORTY-SEVEN  VIOLATION OF THE SOUTH DAKOTA DECEPTIVE
        TRADE PRACTICES  AND CONSUMER PROTECTION LAW  (S.D.
        CODIFIED LAWS § 37-24-6)...................................................88

COUNT FORTY-EIGHT  VIOLATION OF THE TENNESSEE CONSUMER

HB  HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

PROTECTION ACT (TENN. CODE ANN. § 47-18-101, *ET SEQ.*) ..............................88

COUNT FORTY-NINE VIOLATION OF THE TEXAS DECEPTIVE TRADE PRACTICES CONSUMER PROTECTION ACT (TEX. BUS. & COM. CODE §§ 17.41, *ET SEQ.*) ....................................89

COUNT FIFTY VIOLATION OF THE UTAH CONSUMER SALE PRACTICES ACT (UTAH CODE ANN. § 13-11-1, *ET SEQ.*)...........................89

COUNT FIFTY-ONE VIOLATION OF THE VERMONT CONSUMER FRAUD ACT (VT. STAT. ANN. TIT. 9, § 2451 *ET SEQ.*)...........................90

COUNT FIFTY-TWO VIOLATION OF THE VIRGINIA CONSUMER PROTECTION ACT (VA. CODE ANN. §§ 59.1-196, *ET SEQ.*) ...................................91

COUNT FIFTY-THREE VIOLATION OF THE WASHINGTON CONSUMER PROTECTION ACT (WASH. REV. CODE ANN. §§ 19.86.010, *ET SEQ.*)...................92

COUNT FIFTY-FOUR VIOLATION OF THE WEST VIRGINIA CONSUMER CREDIT AND PROTECTION ACT (W. VA. CODE § 46A-1-101, *ET SEQ.*)...................................92

COUNT FIFTY-FIVE VIOLATION OF THE WISCONSIN DECEPTIVE TRADE PRACTICES ACT (WIS. STAT. § 110.18) .......................................92

COUNT FIFTY-SIX VIOLATION OF THE WYOMING CONSUMER PROTECTION ACT (WYO. STAT. §§ 40-12-105 *ET SEQ.*).................................93

DEMAND FOR JUDGMENT..........................................................................93

JURY DEMAND ..........................................................................94

COMPLAINT - v
Case No.

010648.11 949197 V1


1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

Plaintiffs Amber Rainey, Christina Kollmeyer, and Lisa Vogel, on behalf of themselves and all others similarly situated, for their complaint against Defendant Mylan Specialty, L.P., ("Defendant" or "Mylan") allege the following based on (a) personal knowledge, (b) the investigation of counsel, and (c) information and belief.

## I.   INTRODUCTION

1.       The vast majority of allergies result in a mild rash and can be treated with over-the-counter medication.  But people with allergies to certain foods and bee stings can develop anaphylaxis, a severe reaction that causes the airways needed to breathe to swell and close.  If not treated immediately, anaphylaxis can result in death.

2.       Anaphylaxis can be treated with epinephrine, or adrenaline, a naturally occurring hormone and neurotransmitter that has been available for over 100 years and costs pennies to produce.  Nearly ten years ago, Defendant Mylan acquired the rights to market and distribute the EpiPen, a prescription auto-injector containing epinephrine that was originally approved by the FDA in 1987.

3.       Even though epinephrine has been widely available for over a century and all the components of an EpiPen together cost anywhere between $20 and $30 to make,[1] Mylan has increased the list prices of EpiPens *seventeen* times since it acquired the rights to market and distribute the drug in 2007—a ***574 percent increase***—from $90.28 to $608.62.[2]  Mylan's price increases for EpiPen have been so dramatic that some patients have resorted to carrying expired EpiPens, or using syringes to manually inject epinephrine.

4.       Why has the price of a product which Mylan itself did not develop and costs so little to produce gotten so out of control?  EpiPen's list price has skyrocketed because, as Mylan has admitted, it pays "intermediaries" in the pharmaceutical distribution system known as

---

[1] Ben Popken, *Industry Insiders Estimate EpiPen Costs No More Than $30*, NBC News (Sept. 6, 2016), available at http://www.nbcnews.com/business/consumer/industry-insiders-estimate-epipen-costs-no-more-30-n642091.

[2] Allan Coukell, Chuck Shih, and Emily Reese, *Beyond EpiPen: Prices of Lifesaving Epinephrine Products Soar*, The Pew Charitable Trusts (Sept. 22, 2016), available at http://www.pewtrusts.org/en/research-and-analysis/analysis/2016/09/22/beyond-epipen-prices-of-lifesaving-epinephrine-products-soar.

COMPLAINT - 1
Case No.

1918 Eighth Avenue, Suite 3300 • Seattle, WA  98101
(206) 623-7292 • FAX (206) 623-0594

1  pharmacy benefit managers ("PBMs"), and those payments increase the price that many

2  consumers pay.

3       5.     PBMs negotiate prices with drug manufacturers on behalf of health plans.

4  Together, the three biggest PBMs—Express Scripts, CVS Health, and OptumRx—bring in more

5  than $200 billion a year in revenue.  They also control over 80% of the PBM market, covering

6  180 million insured people.

7       6.     Based in part on the prices they are able to secure, PBMs set up "tiered"

8  formularies for their clients (health insurers).  Tiered formularies generally place "preferred"

9  brand drugs into tiers that require patients to make lower co-payments than non-preferred brand

10  drugs, which encourages patients to use those drugs over other therapeutic alternatives.  In

11  addition, a PBM will sometimes exclude certain brand drugs from its formulary, ensuring that

12  health insurers using that formulary will not reimburse their members for purchase of those

13  drugs.  As a result, PBMs have enormous control over drug purchasing behavior because they

14  can push patients toward certain brand drugs over others.

15       7.     To get favorable formulary placement, or less favorable formulary placement for

16  their competitors, drug companies, including Mylan, set list prices for brand drugs high so that

17  they can offer PBMs significant "rebates."  While high list prices of course benefit drug

18  companies, they also benefit PBMs because PBMs get paid in part based on the "spread"—the

19  difference between the high list price set by drug companies and the actual price paid by PBMs.

20  In fact, PBMs get drug manufacturers with products that compete in the same therapeutic class to

21  "compete" by offering to give PBMs the largest rebates, and thus the largest spread.  Thus, while

22  in a competitive world competition would drive drug manufacturers to *lower* their prices,

23  because high list prices benefit both drug manufacturers and PBMs, in the world of branded

24  prescription drugs, the opposite occurs.

25       8.     Neither the drug companies nor the PBMs disclose the rebates given to PBMs,

26  labeling them as trade secrets.  Drug companies do not disclose the amount of rebates they

27  provide to hide that their list price increases have nothing to do with supply or demand for their

28

COMPLAINT - 2
Case No.
010648.11  949197 V1

HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

drugs.  Similarly, PBMs want the rebates they receive to remain secrets because the spread they receive is a substantial portion of a PBMs' profits.

9.  Consistent with this secrecy, Mylan did not disclose that the skyrocketing increases in the list prices for EpiPens was due to the payment of rebates to PBMs until the summer of 2016, when there was public outcry about the skyrocketing costs of EpiPens.  To defend its pricing practices, on September 21, 2016, Mylan N.V.'s CEO, Heather Bresch, testified before the House of Representatives Committee on Oversight and Government Reform that:

> I know there is considerable concern and skepticism about the pricing of EpiPen Auto-Injectors.  I think many people incorrectly assume we make $600 off each EpiPen.  This is simply not true.
>
> In the complicated world of pharmaceutical pricing there is something known as Wholesale Acquisition Cost or WAC.  The WAC for a 2 unit pack of EpiPen Auto-Injectors is $608.  After rebates and various fees, Mylan actually receives $274.[3]

10.  To illustrate this point, Mylan used the following chart, which it described as "The Entire Economic Story of the U.S. Pharmaceutical Supply Chain:"[4]

---

[3] Hearing Before the H. Comm. on Oversight & Gov't Reform, 114th Cong. (Sept. 21, 2016) (testimony of Mylan CEO Heather Bresch), available at https://oversight.house.gov/wp-content/uploads/2016/09/2016-09-21-Mylan-CEO-Bresch-Testimony.pdf.

[4] Press Release, *Mylan Taking Immediate Action to Further Enhance Access to EpiPen*, PRNEWSWIRE (Aug. 25, 2016), available at http://www.prnewswire.com/news-releases/mylan-taking-immediate-action-to-further-enhance-access-to-epipen-epinephrine-injection-usp-auto-injector-300318188.html.

COMPLAINT - 3
Case No.
010648.11  949197 V1

HB   HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

**Figure 1: The Entire Economic Story of the U.S. Pharmaceutical Supply Chain**



11.    Despite entitling its chart, "The ***Entire*** Economic Story," Mylan's explanation omitted important information.  Namely, Mylan lumped all pharmaceutical intermediaries—PBMs, insurers, wholesalers and pharmacy retailers—into the basket of entities that received the $334, implying that those entities received similar amounts.  As this chart,[5] which was *not* created by Mylan, shows, the vast majority of the $334 has been paid to PBMs.

---

[5] *See* AJ Ally, *The EpiPen Price Increase: A Deeper Look at a Complicated Story*, ARGUS HEALTH (Nov. 4, 2016), available at:  https://argus-health.com/2016/11/the-epipen-price-increase-a-deeper-look-at-a-complicated-story/#.

COMPLAINT - 4
Case No.
010648.11  949197 V1

1

2

**Figure 2:  WAC = Wholesale Acquisition Cost, Illustrative Rebate Analysis for a Given Three-Year Period**



WAC = WHOLESALE ACQUISITION COST. ILLUSTRATIVE REBATE ANALYSIS FOR A GIVEN THREE-YEAR PERIOD

14      12.      More broadly, Mylan disclaimed its own role in setting the level of rebates PBMs

receive, instead portraying itself as a victim of a system with corrupt incentives.  As Mylan N.V.

CEO Heather Bresch explained in an August 25, 2016 interview with Brian Sullivan of MSNBC:

> **Heather Bresch:** Look, no one's more frustrated than me. I've been in this business for 25 years…
>
> **Sullivan:** But you're the one raising the price, how can you be frustrated?
>
> **Bresch:** My frustration is there's a list price of $608. There is a system. I laid out that there are four or five hands that the product touches and companies that it goes through before it ever gets to that patient at the counter. No one, everybody should be frustrated, I am hoping that this is an inflection point for this country. Our health care is in a crisis. It's no different than the mortgage and financial crisis back in 2007. This bubble is going to burst.

In the same interview Bresch further explained that "There's no question, the system is broken."

"There's no transparency, there's no clarity and no one knows what anything costs."[6]

---

[6] Press Release, *Mylan Taking Immediate Action to Further Enhance Access to EpiPen*, PR NEWSWIRE (Aug. 25, 2016), available at http://www.prnewswire.com/news-releases/mylan-taking-immediate-action-to-further-enhance-access-to-epipen-epinephrine-injection-usp-auto-injector-300318188.html.

COMPLAINT - 5
Case No.

HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

13.     Mylan is no victim.  Instead, Mylan participated in and benefitted both from the high list price scheme and from paying high rebates or kickbacks to PBMs to ensure EpiPen's market dominance.  In fact, from at least 2008 until 2011, when Mylan stopped reporting this information, EpiPen had a ***95% market share in auto-injectors.***

14.     During the time that the list prices for EpiPen were increasing most dramatically, without any corresponding increase in the cost of production, there were some companies that tried to introduce auto-injectors to compete with EpiPen.  However, those competitors never succeeded in displacing EpiPen's market dominance because they did not pay the rebates Mylan paid the PBMs.  Adrenaclick, one auto-injector, was originally available in brand and generic versions, but eventually the brand version, which had a list price one-third of EpiPen's, was withdrawn from the market because PBMs did not place the drug on formularies.  Auvi-Q, another auto-injector, attempted to match Mylan's list prices but, every time it did, Mylan matched the increase, and, as a result, Auvi-Q fought for months to get the favorable formulary position that EpiPen had before Auvi-Q was withdrawn from the market for other reasons.

15.     If Mylan had been truly concerned about the patients who were victims of how it gamed the system, it could have refused to play the game, and competed based on the merits of its product.  Indeed, Mylan has regularly represented that it believes its auto-injector is superior to those of its competitors.  But Mylan did not make that choice.  Instead, it chose to participate in the scheme described in this Complaint.

16.     Even if it did not lower the list price for EpiPen, Mylan could have exposed this scheme to federal or state agencies, or to the public at large.  Mylan did not do this either and, in fact, after blaming PBMs and other intermediaries for its own inflated prices, has resisted giving the House Committee on Oversight and Government Reform documents including "contracts and communications with manufacturers, suppliers, distributors, insurers, pharmacy benefit managers, and retail pharmacies relating to the sale of its EpiPen device,"[7] which would

---

[7] *See* Ed Silverman, *Lawmakers threaten Mylan with a subpoena for EpiPen documents*, STATNEWS (Feb. 6, 2017), available at https://www.statnews.com/pharmalot/2017/02/06/mylan-subpoena-epipen.

HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

document or at least provide further insight on what it has already admitted has occurred with regard to EpiPens.

17.     Unfortunately, while neither PBMs nor other intermediaries in the pharmaceutical distribution chain pay Mylan's inflated list price, many patients who rely on EpiPen to keep them alive—including consumers with high deductible plans, insured consumers who pay coinsurance (co-payments based on the list price of the drug), or uninsured consumers—do pay either the full list price or an inflated amount based on that price.  Mylan's list price inflation has saddled individuals living with food allergies with crushing out-of-pocket expenses.  Indeed, a recent study in the Journal of the American Medical Association found that between January 2007 and December 2014, out-of-pocket spending per EpiPen patient increased 123.6%, or from $33.80 to $75.50.[8]  Mylan's list price has become an artificial and phony price established and driven up as part of a kickback scheme from Mylan to the PBMs.

18.     This action alleges that Mylan violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962, and various state consumer protection laws by engaging in a scheme and enterprise whose purpose was unlawfully inflating the list price for EpiPen then marketing the spread to PBMs.  This scheme directly and foreseeably causes consumers to overpay for this life-saving medication.

## II.     PARTIES

### A.     Plaintiffs

19.     Plaintiff Amber Rainey resides in Seattle, Washington.  Ms. Rainey purchased EpiPen 2-packs on several occasions from 2014-2016 for herself, because she has severe shellfish and other allergies.  She is currently insured by Premera BlueCross on a high-deductible plan and, after her deductible is met, she is required to make a co-payment based on the price of the drug (coinsurance).  On January 20, 2015, she paid $40.88 for an EpiPen 2-pack.  On March 3, 2016, she paid $53.94 for an EpiPen 2-pack.  As a result of Defendant's scheme, Ms. Rainey overpaid for EpiPens.

---

[8] *See* Kao-Ping Chua, MD, PhD & Rena M. Conti, PhD, Research Letter, JAMA INTERNAL MEDICINE (Mar. 27, 2017).

COMPLAINT - 7
Case No.

HB HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

20.     Plaintiff Christina Kollmeyer resides in Parker, Colorado.  Ms. Kollmeyer has purchased many EpiPen 2-packs for her son, who has a severe allergy.  She and her family are insured by Cigna on a high-deductible plan.  On August 30, 2016, she purchased two 2-packs of EpiPens for $313.38.  On October 19, 2016, she purchased two 2-packs of EpiPens for $313.38.  On January 11, 2017, she purchased 2-packs of EpiPens for $735.09.  As a result of Defendant's scheme, Ms. Kollmeyer overpaid for EpiPens.

21.     Plaintiff Lisa Vogel resides in Takoma Park, Maryland.  Ms. Vogel has purchased EpiPen Jr. 2-packs on several occasions for her son, who has an allergy to peanuts and amoxicillin.  She and her family are insured by Aetna, on a plan that carries a high deductible.  On June 22, 2015, her share of a purchase was $453.49.  On June 13, 2014, her share of a purchase was $351.73.  As a direct result of Defendant's scheme, Ms. Vogel overpaid for EpiPen Jr.

**B.     Defendant**

22.     Defendant Mylan Specialty, L.P. ("Mylan"), formerly known as Dey Pharma, is a Delaware limited partnership with its principal place of business in Canonsburg, Pennsylvania.  It is a subsidiary of Mylan N.V., a leading global pharmaceutical company which develops, licenses, manufactures, markets, and distributes generic, branded generic, and specialty pharmaceuticals.  Approximately 40% of Mylan's operating profits are derived from sales of EpiPen.  In 2014, EpiPen became the first Mylan product to reach $1 billion in annual net sales, and has exceeded that level of sales every year since.

### III.     JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims arise under federal law, and under 18 U.S.C. § 1964(c) because this action alleges violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962.  This Court also has jurisdiction pursuant to 28 U.S.C. § 1332(d), which provides federal district courts with original jurisdiction over civil actions in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs, and is a class action in which any

member of a class of Plaintiffs is a citizen of a state different from any Defendant.  Finally, this Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

24.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c), and 18 U.S.C. § 1965, because Defendant transacts business in, is found in, and/or has agents in this district, and because some of the actions giving rise to the complaint took place within this district.

25.     The Court has personal jurisdiction over Defendant.  Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this district.  The scheme and conspiracy have been directed at, and have had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this district.

## IV.     DRUG PRICING IN THE UNITED STATES

### A.     The Entities Involved in Drug Pricing

26.     The prescription drug industry consists of an opaque and complex network of entities engaged in multiple distribution and payment structures.  For the purpose of this Complaint, the most important entities are pharmaceutical companies, health insurers, PBMs, and patient-consumers.

27.     *Pharmaceutical Companies*.  Pharmaceutical companies (also known as drug companies or drug manufacturers) own the rights to manufacture and market drugs, and typically own or contract with facilities that manufacture drugs and then sell their products to wholesalers.[9]  Mylan is a pharmaceutical company.

28.     *Health Insurers*.  The term "health insurers" covers self-insured businesses, insurance companies, including those that participate in Medicaid and Medicare, and union-run

---

[9] *See, e.g.*, Ernst Berndt & Joseph Newhouse, *Pricing and Reimbursement in U.S. Pharmaceutical Markets* (Harvard Kennedy School, National Bureau of Economic Research, Sept. 2010), at 8.

HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

health plans.[10]  Health insurers cover a portion of their members' drugs costs, submitting payments to pharmacies on behalf of their members.  The remaining amount paid to the pharmacy is paid by the patient or member, in the form of a co-payment or coinsurance.  In some cases, consumers must first meet a deductible—and therefore pay out-of-pocket—before a health insurers will cover a portion of a drug's costs.

29.  ***Pharmacy Benefit Managers***.  As previously explained, pharmacy benefit managers ("PBMs") act as intermediaries between drug manufacturers and health insurers.[11]  In this role, PBMs perform a variety of services on behalf of their health care payer clients, including the negotiation of drug prices with drug companies, creation of formularies, management of prescription billing, construction of retail pharmacy networks for insurers, and provision of mail-order services.[12]  Nonetheless, they generally are "not a direct link in the physical supply chain for pharmaceutical products" because, in most instances, they do not take possession or control of prescription drugs.[13]  The largest PBMs are Express Scripts Holdings Co., CVS Health Corp., and UnitedHealth Group's OptumRx.[14]  Some of these PBMs, such as CVS Health, are part of corporations that also own their own retail pharmacies.

**B.      Different Prices for Different Players**

30.  In a simplified form, when an insured patient comes into a pharmacy to purchase a brand drug, the following occurs:  the patient (via a co-payment) pays the pharmacy, and then the PBM, pursuant to a contract with the insurance company, pays the pharmacy.  The insurance company later pays the PBM.  However, the prices paid by each participating entity are different.

31.  For brand drugs, the list price is a starting point for negotiations between PBMs and drug manufacturers, but PBMs do not pay the list price.  Instead, they exact steep discounts,

---

[10] *Id.*

[11] *See* Thomas Gryta, *What is a 'Pharmacy Benefit Manger?'*, WALL STREET JOURNAL (July 21, 2011), http://www.wsj.com/articles/SB10001424053111903554904576460322664055328.

[12] *Id.*

[13] *See* The Health Strategies Consultancy LLC, *Follow the Pill: Understanding the U.S. Commercial Pharmaceutical Supply Chain*, The Kaiser Family Foundation, 14 (Mar. 2005), http://avalere.com/research/docs/Follow_the_Pill.pdf.

[14] *See Pharmacy-Benefit Managers*, WALL STREET JOURNAL (Mar. 30, 2015), http://blogs.wsj.com/briefly/2015/03/30/pharmacy-benefit-managers-the-short-answer/.

COMPLAINT - 10
Case No.

HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

known as rebates, from the list price.  PBMs are able to do this because, as previously explained, they create formularies for their health insurer clients which determine what portion of their members' drug costs the health insurer pays.  Because drug companies want their drugs to have a favorable formulary position, they will offer one large PBM a deeper price discount in exchange for favorable formulary position.

32.     PBMs also publish formulary "exclusion lists" that identify drugs that are not covered under its plans.  While health insurers have the option not to utilize such lists, if they do not, PBMs can reduce their rebates or raise other plan costs.  Being able to threaten to drop drugs outright gives PBMs significant negotiating leverage.  Consistent with their increasing power to select winners and losers, PBM exclusion lists have grown significantly in the past few years. There were 80 products on Express Scripts's 2016 formulary exclusion list, 66 on its 2015 list and 48 on its 2014 list.  CVS Health's 2016 list has 124 products, and it had 95 products on its 2015 list.  OptumRx likewise introduced a significantly expanded exclusion list in 2016.

33.     PBMs sometimes pass on an undisclosed portion of the rebates they receive to their health insurer clients.  However, while those clients know how much their total rebate payments are, they do not know, and PBMs will not disclose, what rebates are attributable to particular drugs.  But as a result of those rebates, insurers pay much lower prices than list prices. For example, as CVS Health explains in an October 11, 2016 communication to its clients, "[w]hile EpiPen's price has increased 150% over three years, we've been able to keep our [insurer] clients' cost growth to less than 10% per year."  CVS's chart illustrates this point:

COMPLAINT - 11
Case No.
010648.11  949197 V1

**Figure 3: Impact of PBM-negotiated Discounts, Rebates and Price Protection**



CVS explains:  "The chart above demonstrates the impact of PBM management on pricing for EpiPen over three years, including the negotiated discounts, rebates and price protection."[15]  It also shows the exploding rebates Mylan paid from 2013-2016.

34.    Express Scripts has reported similar information.  Specifically, even though list prices of EpiPen rose from $421 to $635 from January 2015, Express Scripts reported that co-payments had remained relatively stable during that same time period—only rising to $73.30 from $73.03.[16]  Express Scripts recently explained that "What we're seeing from Mylan now is indicative of how many pharma companies negotiate during a momentary monopoly—they price as high as they can for as long as they can."[17]

**C.    Consumer Drug Costs**

35.    In the end, the only actors who pay based on inflated list prices are consumers who are uninsured or who are insured but paying for drugs out-of-pocket before they hit their deductibles or paying coinsurance payments based on the list price.  Rising list prices also harm patients who pay coinsurance or reach the Medicare Part D "Donut Hole," because these consumers' payments are tied to a drug's list price.  Indeed, it was these consumers' out-of-

---

[15] *See* http://insights.cvshealth.com/epipen-what-you-need-to-know.

[16] Associated Press, *EpiPen Maker Boosts Discount Programs but Holds Price Steady, Despite Outrage*, Los Angeles Times (Aug. 25, 2016), available at http://www.latimes.com/business/la-fi-mylan-epipen-cost-20160825-snap-story.html.

[17] Andrew Pollack, *Mylan Raised EpiPen's Price Before the Expected Arrival of a Generic*, New York Times (Aug. 24, 2016) (quoting email from David Whitrap, an Express Scripts spokesperson).

COMPLAINT - 12
Case No.

HAGENS BERMAN
1918 Eighth Avenue, Suite 3300 • Seattle, WA  98101
(206) 623-7292 • FAX (206) 623-0594

pocket payments for EpiPen that brought to light Mylan's pricing practices described in this Complaint.

36.     ***Uninsured***.  Uninsured consumers must pay the full list price every time they pick up their prescriptions.  Despite the Affordable Care Act's expansion of Medicaid coverage and establishment of Health Insurance Marketplaces, millions of people—28.5 million in 2015— remain without coverage.  This uninsured population is especially concentrated in states that did not take the Medicaid expansion.  Of the 28.5 million uninsured, reports indicate that 46% tried to get coverage but could not afford it.  The uninsured population may grow drastically in the next few years if the Affordable Care Act is repealed without a suitable replacement.

37.     But the uninsured are not the only patients saddled with high out-pocket-costs. As described more fully below, insured consumers often still pay all or a part of drug list prices.

38.     ***High Deductible Plans***.  The term "deductible" refers to a set amount of healthcare cost an insured must pay for by herself (out-of-pocket) before her plan will begin to contribute to her healthcare costs.  Once a patient reaches her deductible, her health plan begins to contribute, paying a portion of her healthcare costs.  Although most health plans have some form of a deductible, high-deductible health plans are aptly named for their larger-than-average deductibles.[18]  And while high-deductible health plans usually boast lower premiums, they are nonetheless more onerous to patients and families that need expensive care on a regular basis. Insured individuals in high-deductible plans must usually pay full list prices until they hit their deductibles.

39.     The past decade has witnessed a shift away from traditional health plans, which provide broader coverage, toward high-deductible health plans.  In their 2016 survey of employer health benefits, the Kaiser Family Foundation found that 29% of all covered employees are now enrolled in high-deductible health plans, up from 17% in 2011.  Although Preferred Provider Organizations ("PPOs") are still the most common plan type (48% of Americans are enrolled in PPOs), enrollment in PPOs has fallen 10% over the last two years,

---

[18] Although the amounts are adjusted annually to account for the cost of living, for 2017 the IRS has defined a high deductible health plan as any plan with a deductible of at least $1,300 for an individual or $2,600 for a family.

COMPLAINT - 13
Case No.

HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

while enrollment in high-deductible health plans has increased by 8%. Figure 4 illustrates the rising trend in high deductible plans.

**Figure 4: Percentage of Covered Workers Enrolled in High-Deductible Health Plans from 2006-2016[19]**



*Estimate is statistically different from estimate for the previous year shown (p < .05).

NOTE: Covered Workers enrolled in an HDHP/SO are enrolled in either an HDHP/HRA or a HSA-Qualified HDHP. For more information, see the Survey Methods Section. The percentages of covered workers enrolled in an HDHP/SO may not equal the sum of HDHP/HRA and HSA-Qualified HDHP enrollment estimates due to rounding.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2006-2016.



40.     Moreover, deductibles themselves have risen. The average annual deductible for an individual enrolled in a high-deductible plan is now between $2,031 and $2,295, depending on the exact type of plan.[20] The average annual deductible for family coverage is now between $4,321 and $4,364, again, depending on the type of plan.

41.     Overall, in the entire employer-based health plan market, deductibles have risen 12% since 2015—four times faster than premiums increased in the same period. Among all individuals enrolled in employer health plans (both high-deductible plans as well as others), the average deductible in 2016 was $1,478. The average deductible for individuals working at smaller firms is higher than that in large firms ($2,069 vs. $1,238).

---

[19] *2016 Employer Health Benefits Survey*, Kaiser Family Foundation, 3 (2016), https://kaiserfamilyfoundation.files.wordpress.com/2016/09/employer-health-benefits-2016-summary-of-findings.pdf.

[20] There are two primary types of high-deductible health plans: high-deductible plans with Health Reimbursement Arrangements and high-deductible plans with Health Savings Accounts.

COMPLAINT - 14
Case No.

HB HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

42.     Figure 5 shows the increase in health plans with a general annual deductible of

$1,000 or more, broken down by firm size.

**Figure 5: Percentage of Covered Workers Enrolled in a Plan with a General Annual Deductible of $1000 or More for Single Coverage, by Firm Size, from 2006-2016**[21]





* Estimate is statistically different from estimate for the previous year shown (p < .05).
NOTE: These estimates include workers enrolled in HDHP/SO and other plan types. Average general annual health plan deductibles for PPOs, POS plans, and HDHP/SOs are for in-network services.
SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2006-2016.

43.     The average deductibles for plans available under the Affordable Care Act on the

Marketplace Exchanges are also high.  The Marketplace health plans are broken into "metal"

tiers:  bronze, silver, gold, and platinum.  The cheapest plans—bronze and silver—unsurprisingly

come with very high deductibles.  In 2016, the average deductible in such plans were $5,765 for

bronze plans (up from $5,328 in 2015) and $3,064 for silver plans (up from $2,556 in 2015).

44.     Many individuals and families cannot afford to hit their high-deductible costs year

after year.  As a result, rising list prices are particularly harmful to patients in high-deductible

plans.

45.     ***Coinsurance and Copayments***.  In addition to their deductibles, individuals with

insurance must usually make copayments or coinsurance payments for the healthcare services

they need.  For drugs, a copayment is a fixed fee that patients must pay when they pick up their

prescriptions.  Copayment rates vary depending on the drug; drugs in preferred formulary

positions have lower copays, and drugs in disfavored formulary positions require larger copays.

---

[21] *2016 Employer Health Benefits Survey*, *supra* note 19.

COMPLAINT - 15
Case No.

HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

46.     Coinsurance is similar.  However, instead of paying a fixed fee for a particular service, individuals with coinsurance arrangements must pay a fixed *percentage* of the cost of the healthcare service provided.  For drugs, this means a percentage of the drug's list price.  This percentage varies depending on the drug, with lower coinsurance rates for preferred drugs, and higher coinsurance rates for disfavored drugs.

47.     For those who must pay full list prices until they hit their deductibles, copayments and coinsurance obligations begin after they reach their deductibles.  Plans that cover prescription drugs right away, not requiring patients to reach their deductibles first, require copayments or coinsurance contributions for every drug purchase.

48.     For covered workers enrolled in health plans with three or more tiers of cost sharing for prescription drugs, average coinsurance rates are 17% for first-tier drugs, 25% for second-tier drugs, 37% for third-tier drugs, and 29% for fourth-tier drugs.  Although Mylan released an authorized generic at the end of 2016, EpiPen and its competitors are still branded drugs.  Therefore, insurance plans generally classify them as second or third-tier drugs on their formularies.  As a result, coinsurance payments for these drugs can be quite burdensome.

49.     Recently, health plans have been demanding higher and higher coinsurance contributions from patients.  Table 1 shows this trend.

**Table 1: Rising Coinsurance Rates**

| | T2 Brand | T3 Brand | Flat |
|---|---|---|---|
| **Retail Coinsurance Payment** | | | |
| 1998 | 24.7% | 26.0% | 20.7% |
| 1999 | 24.9% | 26.9% | 21.0% |
| 2000 | 26.0% | 28.0% | 22.0% |
| 2001 | 24.0% | 29.0% | 20.0% |
| 2002 | 24.4% | 34.7% | 23.0% |
| 2003 | 24.3% | 32.4% | 22.0% |
| 2004 | 25.0% | 32.0% | 25.0% |
| 2005 | 26.5% | 35.6% | 23.0% |
| 2006 | 26.2% | 36.0% | 23.0% |
| 2007 | 26.4% | 37.9% | 22.0% |
| 2008 | 26.1% | 37.0% | 24.0% |
| 2009 | 26.3% | 35.8% | 22.0% |
| 2010 | 25.2% | 36.6% | 24.0% |
| 2011 | 25.6% | 37.9% | 23.0% |
| 2012 | 26.1% | 37.6% | 22.0% |
| 2013 | 25.5% | 37.1% | 22.0% |
| 2014 | 24.3% | 35.9% | 22.0% |
| 2015 | 27.1% | 41.8% | 22.0% |

50.     Overall, out-of-pocket spending for prescription drugs has shifted away from copayments, toward deductible (because of the growing presence of high-deductible plans) and coinsurance spending over the past decade.  In 2014, patients paid for 24% of their out-of-pocket prescription drug expenses through deductibles, compared to just 4% in 2004.  Similarly, patients paid for 20% of their out-of-pocket drug expenses through coinsurance in 2014, compared to just 3% in 2004.

51.     ***Medicare Part D.***  Finally, patients in Medicare Part D plans—Medicare's prescription drug program—often pay a large portion of their drugs' list prices.  In 2017, the Medicare Part D standard prescription drug plan has a $400 deductible and a 25% coinsurance obligation up to an initial coverage limit of $3,700.  Once Medicare Part D patients meet this $3,700 limit, they fall into the coverage gap, more commonly known as the "Donut Hole."  In the Donut Hole, patients must pay 40% of their brand-name drugs' benchmark prices.  Only once patients total out-of-pocket spending reaches $4,950 will Medicare begin to shoulder 80% of their healthcare costs again.  Figure 6 demonstrates patient cost-sharing in the standard Medicare Part D plan for 2017.

COMPLAINT - 17
Case No.
010648.11  949197 V1

HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

1

**Figure 6: Standard Medicare Prescription Drug Benefit, 2017[22]**



NOTE: Some amounts rounded to nearest dollar. [1]Amount corresponds to the estimated catastrophic coverage limit for non-low-income subsidy (LIS) enrollees ($7,425 for LIS enrollees), which corresponds to True Out-of-Pocket (TrOOP) spending of $4,950, the amount used to determine when an enrollee reaches the catastrophic coverage threshold in 2017.
SOURCE: Kaiser Family Foundation illustration of standard Medicare drug benefit for 2017.



52.     This complex price system leads to insured consumers paying drastically higher prices for EpiPen than their insurers.  If a patient is responsible for all of her drug costs before she hits her deductible, she must pay the list price until she meets her deductible; if she has a coinsurance requirement, she pays for a percentage of the drug's list price; if she is in a Medicare Part D plan and reaches the Donut Hole, she must pay 40% of her brand-name drugs' list prices.  In contrast, insurers receive discounts off the drug companies' list prices, through their PBMs.[23]  In other words, an insurer's payment to the pharmacy at the point of purchase is based on a lower price than the patient's payment.

53.     An example helps illustrate this structure.  A woman who has a child with a peanut allergy needs to purchase a 2-pack of EpiPens.  She goes to her local retail pharmacy where the pharmacist tells her the price is $600.  She has health insurance through her

---

[22] *The Medicare Part D Prescription Drug Benefit,* The Kaiser Family Foundation, 6 (Sept. 26, 2016), http://kff.org/medicare/fact-sheet/the-medicare-prescription-drug-benefit-fact-sheet/.

[23] *See* Congressional Budget Office, *Prescription Drug Pricing in the Private Sector*, 12 (Jan. 1, 2007).

COMPLAINT - 18
Case No.

HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

employer, and her insurance plan requires her to pay a $2,000 deductible and then 30% coinsurance after she has hit her deductible.  If she has not yet reached her deductible, she pays $600 for the 2-pack of EpiPens.  If she has reached her deductible (already paid $2,000 in health care costs), she pays $180 to the pharmacy ($600 x .3).  Her insurance covers the rest of the cost.  The price of the EpiPens to her insurer is not, as she might assume, $420.  Instead, the insurer's price is likely much lower, because her insurer has a contract with a PBM and that PBM has negotiated a rebate from Mylan.

54.    A recent study in the Journal of the American Medical Association shows that, since Mylan acquired the rights to market and distribute the drug, consumers have faced a growing amount of out-of-pocket costs—defined as including copayments, coinsurance payments, and deductible payments— for EpiPens.[24]  The chart below was taken from that study:

**Figure 7: Trends in Annual EpiPen Out-of-Pocket Spending per Patient 2007-2014**



The study concluded that:  "[a]mong commercially insured patients who use EpiPen, annual EpiPen out-of-pocket spending more than doubled between 2007 and 2014.  Simultaneously, the

---

[24] *See* Chua & Conti, *supra* note 8.

HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

1   annual rate of EpiPen prescription fills barely increased, suggesting that the increased financial

2   burden on patients was not driven by higher use." *Id.* at E2.

3   **D.      PBMs Make Money by Manipulating Cost-Saving Incentives**

4       55.     PBMs turn a profit in two primary ways.  First, their health insurer clients pay

5   them service fees for processing prescriptions and operating mail-order pharmacies.  Second,

6   PBMs take a cut of the drug rebates they negotiate with drug companies (with the rest, in some

7   cases, passed on to their health insurer clients).  This rebate arrangement is meant to create an

8   incentive for PBMs to negotiate lower *real* drug prices: the lower the real price they negotiate,

9   the larger the spread (*i.e.*, rebates), the higher their profits.[25]  This business model should create

10  incentives for PBMs to control drug costs.

11      56.     Unfortunately, drug companies and PBMs have found a way to game this system.

12  As both the drug companies and PBMs have realized, the spread can also be enlarged by *raising*

13  *list prices* while holding real prices constant.  In exchange for this spread enlargement, the PBMs

14  agree, either explicitly or implicitly, to favor, or at least not disfavor, the drug with the elevated

15  list price.  The drug company knows that when a drug has a large list price increase, the PBM

16  will be making substantially greater revenue, yet will be paying no more than it previously did so

17  long as the real price does not increase.

18      57.     The perverse, reverse incentives for higher list prices (and consequent

19  overpayments by consumers) was described in a recent report on the drug industry:

20          At the whole-market level, we sense that the price protection
            rebate arbitrage game is driving manufacturers to higher
21          benchmark price increases than would otherwise occur,
            particularly on the eve of a general election.  Price protection
22          rebates between brand manufacturers and PBMs are common, as
            are fixed rebate agreements between PBMs and a significant
23          portion of their plan sponsors.  When brand manufacturers' [list
            price] increases exceed the price protection threshold, the
24          manufacturers rebate the difference to PBMs, who pocket the
            difference when these price protection rebates grow faster than the
25          PBMs' fixed rebate commitments to plan sponsors.  Thus all else
            equal in a given category, the product with the more rapid
26          benchmark price increases is more profitable to the PBM.
            Manufacturers, realizing this, don't want their products
27          disadvantaged, and accordingly are driven to keep their rates of

28  ────────────────
    [25] *Id.*

    COMPLAINT - 20
    Case No.
    010648.11  949197 V1


HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

> benchmark price inflation at least as high, and ideally just a bit
> higher, than peers'.  Durable benchmark price inflation is the
> natural result.  Net price inflation is unaffected, but unit volumes
> suffer as higher benchmark prices directly impact consumers who
> have not yet met their deductibles.[26]

58.    This is not the first instance where PBMs have been caught secretly making

money on an increase in the spread between benchmark and real prices.  In *New England*

*Carpenters Health Benefits Fund v. First DataBank, Inc.*, 244 F.R.D. 79 (D. Mass. 2007), the

court certified a class alleging that McKesson Corporation, one of the country's three largest

wholesalers, and First Data, a drug price publisher, engaged in a scheme to inflate the benchmark

prices of brand name drugs.  McKesson asserted that a class could not be certified because PBMs

had become aware of McKesson's fraudulent spread increase, and promptly acted to offset the

spread by vigorously seeking rebates for their health insurer clients.  However, the Court rejected

this contention based in part on evidence showing that the PBMs pocketed a portion of the

increase in the spread at the expense of consumers and health insurers and then sought to hide

that from their clients:

> Because these PBMs benefited from the increased [benchmark
> price] spreads perpetuated by the Scheme, Plaintiffs argue that they
> had no incentive to inform [third party payers (*i.e.* health insurers)]
> of the inflated AWP, let alone fiercely compete to mitigate any
> damage.  As proof, Plaintiffs quote an April 26, 2002 internal ESI
> e-mail, sent around the same time as the ESI letter, that states that
> "the AWP increases being pushed through by First Data Bank [are]
> having a very favorable impact on our mail margins."  The e-mail
> goes on to state, "Our clients will not be sympathetic to our
> financial situation since we [will have benefited] from the AWP
> increase in the mail and they hired us to control drug trend."  The
> e-mail includes a handwritten note, in response, "Let's put a lid on
> it and not make it a big deal."[27]

As the Court found, PBMs can use phony list prices to their advantage.

59.    In this scheme, the PBMs gain the opportunity to exact larger rebate profits,

without paying any more money for the drugs themselves.  And all the while, the PBMs can

boast of the "increased rebates" they have achieved, when, in reality, the "discount" they have

---

[26] Richard Evans, Scott Hinds, & Ryan Baum, *US Rx Net Pricing Trends Thru 2Q16*, SSR LLC, 36 (Oct. 5, 2016).

[27] *New England Carpenters Health Benefits Fund v. First Data Bank, Inc.*, 248 F.R.D. 363, 367 (D. Mass 2008) (internal citations omitted).

COMPLAINT - 21
Case No.

HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

achieved is simply a reduction off an artificially inflated list price.  The drug company benefits

from this scheme both by a higher list price and by maintaining a formulary position it might

otherwise have lost.

60.     The losers in this scheme are patients.  When drug companies inflate list prices so

that they can offer PBMs larger spreads, they harm uninsured patients, who must pay those

prices out-of-pocket.  They also hurt insured consumers in high-deductible plans who must pay

the artificially inflated list prices until they hit their deductibles.  Consumers paying coinsurance

suffer because their coinsurance payments rise with list price increases.  So, too, do Medicare

Part D patients, especially when they reach the Donut Hole.

## V.     EPIPEN

### A.     Food Allergies

61.     As many of 15 million Americans and 1 in 13 children have severe food allergies,

such as allergies to peanuts or tree nuts.[28]  Many more have other types of severe allergies such

as allergies to bee stings.  When people with such allergies are exposed to allergens, they can

experience anaphylaxis, a condition which, if not immediately treated, can lead to immediate

respiratory or cardiac arrest and potentially death.

62.     Until 1980, epinephrine was delivered primarily by using a vial and syringe.

However, military research eventually led to the development of auto-injectors, or a spring-

loaded syringe, which allowed emergency doses of epinephrine to be administered much more

quickly and safely.[29]

### B.     The Growth in the Market for Auto-Injectors

#### 1.     Mylan did not develop the EpiPen, but bought the rights to market and distribute the drug.

63.     EpiPen is an auto-injector.  Survival Technology, which ultimately became

Meridian Medical Technologies, received approval from the Food and Drug Administration

---

[28] Michael A. Carrier & Carl J. Minniti III, *The Untold EpiPen Story: How Mylan Hiked Prices By Blocking Rivals*, 102 CORNELL L. REV. 53 (2017).

[29] Lydia Ramsey, *The Strange History of the EpiPen, the Device Developed by the Military that Turned into a Billion-Dollar Business*, BUSINESS INSIDER (Aug. 27, 2016), available at http://www.businessinsider.com/the-history-of-the-epipen-and-epinephrine-2016-8.

HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

("FDA") for EpiPen in 1987.[30]  King Pharmaceuticals acquired Meridian in 2002, and Pfizer purchased King in 2010.  Meridian, a Pfizer subsidiary, continues to manufacture the EpiPen today.

64.     While EpiPen has been on the market since 1988, Mylan did not develop the product.  Instead, it acquired the rights to market and distribute it when in 2007 Mylan acquired Merck KGaA, Merck's generic pharmaceutical business.[31]  At the time Mylan acquired the right to market and distribute EpiPen, the list price for a two-pack of the drug was $124.[32]

65.     The standard justification used by drug companies for skyrocketing prices is that they have significant research and development costs.  Because Mylan acquired EpiPen from another company and therefore cannot credibly claim that its price hikes are due to its research and development costs, it ultimately justified its prices differently, by saying that it spent $1 billion to improve "access" to EpiPens.  In fact, in a recent interview with Politico's Dan Diamond, Mylan CEO Heather Bresch put this quite plainly, claiming that Mylan's innovation with EpiPen is "you having access to the product."[33]  In essence, Bresch attributed EpiPen's price increases to money spent on *lobbying* efforts designed to ensure that Mylan's EpiPen had a larger customer base.

66.     Between 2011 and 2015, the number of EpiPen prescriptions written in the United States rose from 2.5 million to more than 3.5 million.  Since acquiring the rights to market and distribute EpiPen, Mylan's revenues on the drug increased from $200 million to more than $1 billion.[34]  Today, the device provides roughly 40% of Mylan's operating profits.  *Id.*

---

[30] Carrier & Minniti, *supra* note 28, at 53.

[31] *Id.*

[32] Matthew Harper, *The Insurance Rip-Off At the Heart of the EpiPen Scandal*, FORBES (Aug. 30, 2016), available at http://www.forbes.com/sites/matthewherper/2016/08/30/the-consumer-rip-off-at-the-heart-of-the-epipen-scandal/#68e4b662a87e.

[33] *See "She raised the price of EpiPen.  He works to bring drug prices down."* (Feb. 23, 2017), available at: https://soundcloud.com/politico-pulsecheck/epipen-and-pcma.

[34] Cynthia Koons & Robert Langreth, *How Marketing Turned the EpiPen into a Billion-Dollar Business*, BLOOMBERG BUSINESSWEEK (Sept. 23, 2015), available at https://www.bloomberg.com/news/articles/2015-09-23/how-marketing-turned-the-epipen-into-a-billion-dollar-business.

HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

67.     From 2008 through 2011, Mylan itself reported that the EpiPen had greater than a 95% market share in the auto-injector market.[35]  In 2012 Mylan stopped including such data in its annual report, but, as the Bloomberg chart below makes clear,[36] although Mylan has faced competition in the auto-injector market, that competition has been unable to displace EpiPen's dominance:

**Figure 8: Mylan Dominates the Market for Adrenaline Auto-Injectors**



[35] Carrier & Minniti, *supra* note 28, at 56-57 n.25.

[36] *See* David Crow, *Drugs 'middlemen' under the spotlight in EpiPen furore*, FINANCIAL TIMES (Sept. 9, 2016), available at:  https://www.ft.com/content/489f7276-75cc-11e6-b60a-de4532d5ea35

COMPLAINT - 24
Case No.

HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

010648.11  949197 V1

**2.      No EpiPen competitor has gained a toehold in the auto-injector market.**

68.     As set forth in the chart and described below,[37] no EpiPen competitor has been able to dethrone EpiPen from its dominance in the auto-injector market.  The number of prescriptions written for EpiPen dwarf those written for any other auto-injector:

**Figure 9: EpiPen vs. Competitors:  Prescriptions 2011-2015**



Likewise, EpiPen's sales dwarf those of any other auto-injector:[38]

---

[37] *See* Lydia Ramsey & Andy Kiersz, *EpiPen's skyrocketing prices can't be blamed on no competition*, BUSINESSINSIDER (Sept. 13, 2016), available at http://www.businessinsider.com/epipen-prescriptions-auvi-q-adrenaclick-2016-9.

[38] *Id.*

COMPLAINT - 25
Case No.

HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

1

**Figure 10: EpiPen vs. Competitors:  Sales 2011-2015**

2



3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

a.      **Twinject/Adrenaclick**

18

69.      At the time the EpiPen was introduced, the only other auto-injector available was

19

Twinject, launched by Verus Pharmaceuticals.[39]  In 2010, the product, renamed Adrenaclick,

20

was reintroduced in the United States in brand and generic versions.[40]

21

70.      Because PBMs would not include the product on their formularies, it was

22

discontinued in 2012.  A year later, its owner at the time, Amedra Pharmaceuticals, stopped

23

competing with EpiPen and instead marketed only the generic version of Adrenaclick at a list

24

price of $400.  Drug companies do not pay rebates on generic drugs.

25

26

27

[39] http://www.prnewswire.com/news-releases/verus-pharmaceuticals-announces-us-launch-of-twinject-for-anaphylaxis-54875892.html.

28

[40] http://www.businesswire.com/news/home/20100107006249/en/Sciele-Introduces-Adrenaclick%E2%84%A2-epinephrine-injection-USP-Auto-Injector.

71.     Today, Adrenaclick's current owner, Impax Laboratories, continues to market the generic version of the drug.  It currently holds just under 10% of the auto-injector market.

**b.     Auvi-Q**

72.     In January 2013, Sanofi introduced a competing epinephrine injector, Auvi-Q.  It was hailed as an improved alternative to EpiPen, and had a slim, rectangular, pocket-friendly design and voice instructions that guided users through the injection process.  At the time Auvi-Q was introduced, its list price was ten percent higher than the list price for EpiPen.

73.     While Auvi-Q eventually garnered approximately 10% of the market, Sanofi withdrew the product from the market in October 2015 after reports that it was not delivering proper doses of epinephrine.

74.     After the public outrage regarding EpiPen's list prices, the product was subsequently reintroduced by Kaléo Pharma in 2017.

**c.     Despite competition for EpiPen, list prices for auto-injectors have risen sharply.**

75.     Unlike in normal markets, the potential or actual competition from other auto-injectors did not lower the list prices for auto-injectors.  Instead, as set forth below, even the presence of EpiPen's most vigorous (in relative terms) competitor, Auvi-Q, only made those increases greater.  In fact, while Mylan's price increases for EpiPen began in 2009, the largest increases started in 2013, when Auvi-Q entered the market.

| Date | Auto-Injector | List Price |
|---|---|---|
| January 2009 | EpiPen | $124 |
| December 2012 | EpiPen | $241 |
| January 2013 | Auvi-Q | $241 |
| July 2013 | EpiPen | $265 |
| July 2013 | Auvi-Q | $277 |
| November 2013 | EpiPen | $304 |
| December 2013 | Auvi-Q | $334 |
| October 2015 | EpiPen | $461 |
| October 2015 | Auvi-Q | $509 |

Ironically, EpiPen's list price increased again in October 2015, when Auvi-Q was withdrawn from the market.  The chart below likewise reflects this.[41]

**Figure 11: EpiPen vs. Auvi-Q:  The Effect of Competition from 8-3-2010 through 5-16-2016**



76.     Indeed, as shown in the chart below, none of EpiPen's competitors served to moderate the list prices for auto-injectors.[42]

---

[41] Harper, *supra* note 32.

[42] http://www.pewtrusts.org/en/research-and-analysis/analysis/2016/09/22/beyond-epipen-prices-of-lifesaving-epinephrine-products-soar.

COMPLAINT - 28
Case No.

HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

**Figure 12: Increasing Price of Epinephrine Auto-Injectors**





Note: Analysis of list prices is based on wholesale acquisition cost (WAC) data collected by First Databank, http://www.fdbhealth.com/policies/drug-pricing-policy/. WAC represents published catalogue or list prices and may not represent actual transactional prices. For each auto-injector, we report the price of a pack of two 0.3 mg/0.3 ml injection devices. Information on product effective and obsolete dates was reported to First Databank. Data were pulled from Analy$ource on Sept. 14, 2016.

Source: Analy$ource as reprinted with permission by First Databank Inc. All rights reserved. ©2016.

© 2016 The Pew Charitable Trusts

### C.      The Real Reason for EpiPen's Increasing List Prices

77.      The list prices for EpiPen have skyrocketed because keeping those prices high pays PBMs a spread, guaranteeing EpiPen its dominance in the auto-injector marketplace.  Not coincidentally, during the periods when auto-injector list prices increased most substantially, Mylan was seeking to ensure that Auvi-Q was not available to consumers insured under large health plans.

78.      Mylan's high list prices for EpiPen worked.  In 2014, Express Scripts excluded Auvi-Q from its formulary, but, by paying Express Scripts significant rebates, Mylan's EpiPen and EpiPen Jr. remained on the formulary.[43]  Express Scripts defended the exclusion by saying: "[i]n 2014 and 2015, we leveraged the competition between EpiPen and Auvi-Q to earn additional discounts for our clients."[44]  By 2015, Auvi-Q had learned its lesson, and likewise

---

[43] Katie Thomas, *An EpiPen Rival Is About to Return to the Shelves*, NEW YORK TIMES (Oct. 26, 2016).

[44] *See* Popken, *supra* note 1.

HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

010648.11  949197 V1

paid Express Scripts significant rebates in order to be restored to its formulary.  *Id.*  Similarly, in 2015, Caremark (now CVS Health) did not cover Adrenaclick, presumably because of the generous rebates offered by Mylan.  In 2016, EpiPen and EpiPen Jr. were the only two preferred brands on OptumRx's Premium Formulary.

79.     On an August 7, 2014 Mylan earnings call—before EpiPen's pricing received such public scrutiny—Mylan N.V.'s CEO Heather Bresch did not deny that EpiPen's marketing "leadership" was due to rebate payments:

> Elliot Wilbur – Needham & Company, LLC, Research Division:
> First question is for Heather with regard to the EpiPen franchise. Obviously, you're seeing a lot of noise in the market and a lot of shifting regarding formulary positioning. And I guess, despite the fact that EpiPen is a dominant product in the category; and sort of the price leader, it still maintained very strong formulary positioning. And I'm just curious sort of what the trend has been in rebating on the product. ***Whether that strong formulary position has come increasingly at the cost of higher rebates?***
>
> Heather Bresch:  Okay. Sure, Elliot. So what I'd say, Elliot, around EpiPen, obviously, when you've got a multiple epinephrine product marketplace, it leads to a more competitive positioning both with the pharmacies, as well as payers. I think that given the breadth and scope of our business that we've been able to manage and to obviously remain very competitive in that structure. But with that being said, ***we're going to do whatever we need to do to really maintain that market leadership***, and like I said, and continue to look at ways that we can enhance and add to this franchise.[45]

80.     Mylan's spread-increasing behavior is also visible from data—not released by Mylan itself—estimating (in pink) how much Mylan pays in rebates to PBMs and insurers:[46]

---

[45] *See* Mylan's (MYL) CEO Heather Bresch on Q2 2014 Results – Earnings Call Transcript, available at: https://seekingalpha.com/article/2395925-mylans-myl-ceo-heather-bresch-on-q2-2014-results-earnings-call-transcript (emphasis added).

[46] *See* AJ Ally, *The EpiPen Price Increase:  A Deeper Look at a Complicated Story*, ARGUS HEALTH, available at:  https://argus-health.com/2016/11/the-epipen-price-increase-a-deeper-look-at-a-complicated-story/#.

**Figure 13: WAC = Wholesale Acquisition Cost, Illustrative Rebate Analysis for a Given Three-Year Period**



WAC = WHOLESALE ACQUISITION COST. ILLUSTRATIVE REBATE ANALYSIS FOR A GIVEN THREE-YEAR PERIOD

### D.    The Impact of Mylan's Artificial Pricing

81.    While Mylan's practice benefits both itself and PBMs, it harms consumers. They shoulder the burden of the higher list prices, paying more out-of-pocket for EpiPens.  As previously explained, Mylan's astronomical price hikes have hit a number of patient groups particularly hard—the uninsured, those with high deductibles, those with high coinsurance rates, and those who hit the Medicare Part D Donut Hole.  Mylan itself has admitted that fifteen percent of EpiPen patients—"including uninsured and ineligible for our Patient Assistance Program, Medicare Part D beneficiaries at certain points of their coverage period, or participants in high deductible health plans"—may pay an out-of-pocket cost influenced by EpiPen's benchmark price.[47]  Mylan CEO Heather Bresch has conceded that these consumers are the victims of EpiPen's high list prices:

> The patient is paying twice. . . . They're paying full retail price at the counter, and they're paying higher premiums on their insurance.

---

[47] Letter from Mylan to Sen. Charles E. Grassley, Chairman, S. Comm. on the Judiciary (Sept. 8, 2016), at 3 (available at http://www.grassley.senate.gov/sites/default/files/constituents/ Mylan%20Response%20to%20Sen%20Grassley%209%208%2016%20(002).pdf.

HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

> It was never intended that a consumer, that the patients would be paying list price, never. The system wasn't built for that.[48]

82.     Currently, 150 million Americans get health insurance through their employers. Increasingly, individuals within this group are unable to afford EpiPens due to the cost-sharing obligations their health plans impose.

83.     While Mylan touts its Patient Assistance Program ("PAP") and My EpiPen Savings Card program, it admits that those programs "did not keep pace with the evolving health care system, and, as a result, some patients are facing out-of-pocket costs."[49]  The increasing number of patients with high-deductible plans and coinsurance obligations, together with the rise in coinsurance rates, has made the pain associated with the EpiPen price hikes particularly acute. Although epinephrine has been available for over a century, Mylan price hikes have put EpiPen out of reach for many consumers.

84.     For Plaintiffs and many Class members, Mylan's artificial price inflation has cost them their health, financial stability, and emotional well-being.  Unable to afford EpiPens, many patients are now facing grave risks.  They have started carrying expired EpiPens, or manually-filled syringes of epinephrine, even when they lack the medical training necessary to properly administer an injection.

85.     PBMs and insurers claim that their scheme of discounts and rebates ultimately benefits plan enrollees by providing them with lower drug costs.  Even assuming that some part of the discounts does reach insured patients (after the PBMs and insurers have both taken their cuts), these discounts are never redistributed to uninsured patients.  It also does not come back to under-insured patients—those in plans with high deductibles and coinsurance obligations—who must pay much of their prescription drug costs out-of-pocket.  Many patients cannot afford to hit their deductibles year after year.  They must begin to ration their EpiPens before they hit their deductibles and their insurers begin to kick in a portion.

---

48 Dan Mangan & Anita Balakrishnan, *Mylan CEO Bresch: 'No one's more frustrated than me' about EpiPen price furor*, CNBC NEWS (Aug. 25, 2016), available at http://www.cnbc.com/2016/08/25/mylan-expands-epipen-cost-cutting-programs-after-charges-of-price-gouging.html.

49 *See* Grassley letter, *supra* note 48.



86.     Cognizant of the damage increasing list prices have inflicted on patients, the company has announced three things since the publicity associated with Mylan's EpiPen pricing. First, it will offer a $300 coupon to lower- and middle-income customers who have to pay for EpiPen out-of-pocket.  Second, it doubled the income level at which families are eligible for assistance under its PAP to 400% of the federal poverty level.  Finally, Mylan introduced an authorized generic priced for $300, half the price of the branded product.

87.     These measures still do not end or even address the insidious practice of competing for PBM business based on the spread between list and net price.  Nor do they make whole the patients who have spent hundreds or thousands of dollars out-of-pocket on EpiPens for the past few years.  Therefore, these measures fail to address the structural issues that have given rise to the price hikes that have hurt food allergy patients for years.

88.     In a recent letter to Senator Grassley, Mylan attempted to explain why it had not simply reduced its list price:

> We have been asked:  "Why are you not lowering the list price of EpiPen?"  The short answer is this:  Mylan assessed available options under the existing pharmacy billing models to achieve the goal of delivering cost savings for patients with high out-of-pocket expenses and concluded that offering a generic version of EpiPen Auto-Injector [at $300] would yield significantly greater and more sustainable cost savings for patients than a reduction in WAC of the brand version would.  In fact, we expect that, in the future, the vast majority (more than 85%) of epinephrine auto-injector prescriptions will be written for or filled with the less expensive generic version of EpiPen Auto-Injector.[50]

In short, Mylan did not lower the list price because exposing the "pharmacy billing models" would hurt the company because it would hurt PBMs.

## VI.     TOLLING OF THE STATUTE OF LIMITATIONS

### A.     Discovery Rule Tolling

89.     Plaintiffs and Class members had no way of knowing about Mylan's scheme and deception with respect to EpiPen pricing.  Mylan itself has recently reiterated that "[w]e do not comment on the terms of third-party contracts."[51]

---

[50] *Id.* at 4.

[51] *See* Popken, *supra* note 1.

HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

90.     PBMs refuse to disclose the real costs of EpiPen, labeling them trade secrets. Hence, a reasonable plaintiff and consumer could not discover the truth.  Consumers' health insurance plans likewise do not know the amount of rebates paid by Mylan and, because rebates are not paid by drug, they would be difficult if not impossible for a health insurer to learn.

91.     Within the period of any applicable statutes of limitation, Plaintiffs and members of the proposed class could not have discovered through the exercise of reasonable diligence that Mylan was concealing the conduct complained of herein and misrepresenting the true cost of EpiPens.

92.     Plaintiffs and the other Class members did not discover, and did not know of facts that would have caused a reasonable person to suspect, that Mylan was engaged in the scheme and was publishing phony list prices, nor would reasonable and diligent investigation have disclosed the true facts.

93.     For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to all vehicles identified herein.

**B.      Fraudulent Concealment Tolling**

94.     All applicable statutes of limitation have also been tolled by Mylan's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the period relevant to this action.

**C.      Estoppel**

95.     Mylan was under a continuous duty to disclose to Plaintiffs and Class members the true character, quality, and nature of the list prices upon which their payments for EpiPens were based.

96.     Based on the foregoing, Mylan is estopped from relying on any statutes of limitations in defense of this action.

**VII.    CLASS ACTION ALLEGATIONS**

97.     Plaintiffs bring this action on behalf of themselves and all others similarly situated under Federal Rule of Civil Procedure 23(a) and (b)(3), as representatives of a class defined as

COMPLAINT - 34
Case No.

HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

follows:

> All persons in the United States and its territories who paid any portion of the purchase for an EpiPen prescription[52] at a price calculated by reference to Mylan's list price.

Excluded from the class are:  (a) Mylan and any entity in which it has a controlling interest, and their legal representatives, officers, directors, assignees, and successors; (b) any co-conspirators, and their officers, directors, management, employees, subsidiaries, and affiliates.  Also excluded are any federal, state, or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

98.     There are a number of ways in which a person may pay a portion of the purchase price of an EpiPen and thereby gain inclusion in the class.  First, a person may be uninsured and, therefore, responsible for paying 100% of the cost of her prescription needs (the "uninsured scenario").  Second, a person's insurance plan may require her to satisfy a deductible before insurance benefits cover all or a portion of their prescription needs.  If so, that person is paying for 100% of the cost of any prescriptions filled before the deductible is met (the "deductible scenario").  Third, a person may have a coinsurance requirement—an obligation to a portion of any prescription or medical benefit that they purchase, which is expressed as a percentage of the cost of the medication or service provided (the "coinsurance scenario").  If so, she would be responsible for paying for a portion of the purchase of an EpiPen, consistent with the terms of her plan.  Fourth, a person may obtain insurance through a Medicare Part D Plan; if so, there is a coverage gap, often referred to as the "Donut Hole" (the "Donut Hole scenario").  Once that person and her plan has spent a stated amount of money on prescription drugs, the person becomes responsible for 40% of the cost of her brand-name prescriptions until her total annual out-of-pocket expenses reaches the next stated benchmark amount.  After this benchmark, her plan covers the majority of her drug costs again.  All of these individuals qualify as direct purchasers.

---

[52] For the purpose of the class definition, EpiPen prescription is defined to include prescriptions for EpiPen or EpiPen Jr.

HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

99.     In each of these scenarios—the uninsured scenario, the deductible scenario, the coinsurance scenario, and the Donut Hole scenario—a person's out-of-pocket expenses for EpiPens are determined by its list prices.  Accordingly, each falls within the class definition.

100.     Members of the class are so numerous and geographically dispersed that joinder of all members is impracticable.  Hundreds of thousands of prescriptions are written for EpiPens throughout the United States every week, and these prescriptions are filled by hundreds of thousands of individuals.  The class is readily identifiable from information and records in Mylan's possession.

101.     Plaintiffs' claims are typical of the claims of the members of the class.  Plaintiffs and all members of the class were damaged by the same wrongful conduct—*i.e.*, paying artificially-inflated prices for EpiPens.

102.     Plaintiffs will fairly and adequately protect and represent the interests of the class. The interests of Plaintiffs are coincident with, and not antagonistic to, those of the other members of the class.

103.     Counsel that represent Plaintiffs are experienced in the prosecution of class action antitrust litigation and have particular experience with class action antitrust litigation involving pharmaceutical products and extensive experience in class actions including the use of list pricing.

104.     Questions of law and fact common to the members of the class predominate over questions that may affect only individual class members because Mylan has acted on grounds generally applicable to the entire class, thereby making overcharge damages with respect to the class as a whole appropriate.  Such generally applicable conduct is inherent in Mylan's wrongful conduct.

105.     Questions of law and fact common to the class include:

    i.     Whether the list price set by Mylan is used as a list for payments by class members;

    ii.     What the list price for Mylan is;

    iii.     Whether Mylan is engaged in a course of conduct that improperly inflated

HB  HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

the list-to-real price ratio and the ultimate list price used by Plaintiffs and class members as a basis for reimbursement;

iv.   Whether Mylan artificially inflated the list price;

v.    Whether Mylan gave rebates to PBMs that created substantial spreads between the list price and PBM negotiated price;

vi.   Whether the large spread between these prices benefitted the PBMs;

vii.  Whether the large list-to-real price spread was intended to induce the PBMs to give EpiPen favorable placement on the PBMs' formularies;

viii. Whether the large spread did induce the PBMs to give EpiPen favorable placement on the PBMs' formularies;

ix.   Whether Defendant conspired with the PBMs from the Pricing Enterprise for the purpose of carrying out its pricing fraud;

x.    Whether Defendant conducted, or participated in the conduct of, the Pricing Enterprise;

xi.   Whether Mylan or the PBMs engaged in mail or wire fraud in furtherance of the Pricing Enterprise;

xii.  Whether Mylan engaged in a pattern and practice that caused Plaintiffs and class members to make inflated payments for EpiPens;

xiii. Whether Mylan engaged in deceptive fraudulent conduct;

xiv.  Whether Mylan's deceptive and/or fraudulent activity was intended to defraud or harm Plaintiffs and class members;

xv.   Whether Mylan's conduct violated RICO or the State Consumer Protection Statute; and

xvi.  Whether Mylan is liable to Plaintiffs and the class members for damages flowing from its misconduct.

106.   Class action treatment is a superior method for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued

COMPLAINT - 37
Case No.
010648.11  949197 V1



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

individually, substantially outweighs potential difficulties in management of this class action.

107.    Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## VIII.   CLAIMS FOR RELIEF

### COUNT ONE

### VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO"), 18 U.S.C. § 1961, *ET SEQ.*

108.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

109.    This claim is brought on behalf of the class against Mylan for actual damages, treble damages, and equitable relief under 18 U.S.C. § 1964 for violations of 18 U.S.C. § 1962, *et seq.*

110.    Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

111.    Plaintiffs and the members of the class are each "persons," as that term is defined in 18 U.S.C. § 1961(3), who were injured in their business or property as a result of Mylan's wrongful conduct.

### A.    The EpiPen Pricing Enterprise

112.    Under 18 U.S.C. § 1961(4), a RICO "enterprise" may be an association-in-fact that, although it has no formal legal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's purpose.

113.    Mylan formed just such an association-in-fact enterprise—sometimes referred to in this complaint as the EpiPen Pricing Enterprise.  The EpiPen Pricing Enterprise consists of (a) Mylan, including its employees and agents; (b) the PBM CVS Caremark, including its employees and agents; (c) the PBM Express Scripts, including its employees and agents; and



(d) the PBM OptumRx, including its employees and agents.

114. The EpiPen Pricing Enterprise is an ongoing and continuing business organization consisting of "persons" within the meaning of 18 U.S.C. § 1961(3) that created and maintained systematic links for a common purpose:  to secure an exclusive, or at least favorable, formulary position for EpiPen, as a treatment for allergic reactions to food allergies to the exclusion or detriment of competitor products and consumers, and to raise the list price for the purpose of providing PBMs larger rebates.  In other words, the enterprise set prices with the purpose of providing PBMs with a kickback.

115. To accomplish this purpose, the EpiPen Pricing Enterprise periodically and systematically inflated the list price of EpiPen and represented—either affirmatively or through half-truths and omissions—to the general public, health care payers, and consumers, including Plaintiffs and the class, that EpiPen's list price fairly and accurately reflected the actual cost of this drug.  The EpiPen Pricing Enterprise concealed from the public, health care payers, and consumers, like Plaintiffs and the class members, the existence and amount of steep rebates Mylan gave to the PBMs.  The EpiPen Pricing Enterprise also concealed from the public the purpose of these rebates:  the difference between the list price and the real price of EpiPen negotiated by the PBMs resulted in increased profits for the PBMs.  These large rebates served to ensure that the PBMs would place, and maintain, EpiPen in a preferred or favorable position on the PBMs' formularies.  By securing formulary position, the EpiPen Pricing Enterprise ensured that a larger number of EpiPen prescriptions would be written and filled.  This scheme translated into higher sales (and therefore profits) for Mylan and larger spreads for the PBMs.

116. The persons engaged in the EpiPen Pricing Enterprise are systematically linked through contractual relationships, financial ties, and continuing coordination of activities, as spearheaded by Mylan.  There is regular communication between Mylan and each of the PBMs, in which information is shared.  Typically, this communication occurred, and continues to occur, through the use of the wires and the mail in which Mylan and the PBMs share information regarding the EpiPen list price and discuss and agree on rebate amounts.  Mylan and the PBMs

functioned as a continuing unit for the purposes of implementing the EpiPen pricing scheme and, when issues arise during the scheme, each agreed to take actions to hide the scheme and continue its existence.

117.    At all relevant times, CVS Caremark was aware of Mylan's conduct, was a knowing and willing participant in that conduct, and reaped profits from that conduct. CVS Caremark struck rebate deals with Mylan to conceal the true price of EpiPen and its profit from the inflated list prices. CVS Caremark represented to the public that the rebates it negotiated saved health care payers and their plan members (including Plaintiffs and members of the class) money on their prescription needs. But it knew that the rebates did not actually decrease the cost of EpiPen for consumers, because the published list price was falsely inflated. CVS Caremark also knew, but did not disclose, that the other PBMs—Express Scripts and OptumRx—were engaged in the same rebating scheme, to the detriment of consumers. But for the EpiPen Pricing Enterprise's unlawful fraud, CVS Caremark would have had the incentive to disclose the deceit by Mylan, thereby forcing competition on real price. By failing to disclose this information, CVS Caremark perpetuated the EpiPen Pricing Enterprise's scheme, and reaped substantial profits.

118.    At all relevant times, Express Scripts was aware of Mylan's conduct, was a knowing and willing participant in that conduct, and reaped profits from that conduct. Express Scripts struck rebate deals with Mylan to conceal the true price of EpiPen and profit from the inflated rebates. Express Scripts represented to the public that the rebates it negotiated saved health care payers and their plan members (including Plaintiffs and members of the class) money on their prescription needs. But it knew that the rebates did not actually decrease the cost of EpiPen for consumers, because the published list price was falsely inflated. Express Scripts also knew, but did not disclose, that the other PBMs—CVS Caremark and OptumRx—were engaged in the same rebating scheme, to the detriment of consumers. But for the EpiPen Pricing Enterprise's unlawful fraud, Express Scripts would have been incentivized to disclose the deceit by its competitors, thereby obtaining a competitive advantage. By failing to disclose this

information, Express Scripts perpetuated the EpiPen Pricing Enterprise's scheme, and reaped substantial profits.

119.    At all relevant times, OptumRx was aware of Mylan's conduct, was a knowing and willing participant in that conduct, and reaped profits from that conduct.  OptumRx struck rebate deals with Mylan to conceal the true price of EpiPen and profit from the inflated rebates. OptumRx represented to the public that the rebates it negotiated saved health care payers and their plan members (including Plaintiffs and members of the class) money on their prescription needs.  But it knew that the rebates did not actually decrease the cost of EpiPen for consumers, because the published list price was falsely inflated.  OptumRx also knew, but did not disclose, that the other PBMs—CVS Caremark and Express Scripts—were engaged in the same rebating scheme, to the detriment of consumers.  But for the EpiPen Pricing Enterprise's unlawful fraud, OptumRx would have been incentivized to disclose the deceit by its competitors, thereby obtaining a competitive advantage.  By failing to disclose this information, OptumRx perpetuated the EpiPen Pricing Enterprise's scheme, and reaped substantial profits.

120.    Furthermore, as public scrutiny, media coverage, and congressional investigations have focused on the rapidly-inflating prices of EpiPen, the PBMs did not challenge Mylan's reported list prices, terminate their role in the EpiPen Pricing Enterprise, nor disclose publicly that the EpiPen list price did not accurately reflect the price actually paid for the drug.

121.    CVS Caremark, Express Scripts, and OptumRx participated in the conduct of the EpiPen Pricing Enterprise, sharing the common purpose of inflating the list price for EpiPen, through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) and (5), which includes multiple instances of mail fraud in violation of 18 U.S.C. § 1341, and multiple instances of wire fraud in violation of 18 U.S.C. § 1343.  The PBMs knowingly made material misstatements to health care payers, plan members, and the general public in furtherance of the fraudulent scheme regarding:

      a.    The actual price of EpiPen;

      b.    The extent to which the actual price of EpiPen departed from the

1  published, artificially-inflated list price;

2        c.     The extent to which Mylan and the PBMs negotiated the rebates

3  discounting the list price of EpiPen for a purpose other than the PBMs' own enrichment;

4        d.     Whether the rebates were intended to benefit health care payers, plan

5  members, and/or the general public;

6        e.     Whether the rebates saved health care payers, plan members, and the

7  general public money;

8        f.     Whether EpiPen's preferred formulary status reflected the drug's safety,

9  efficacy, or cost-effectiveness, as determined by the PBMs' P&T Committees;

10        g.     Whether EpiPen would have been placed in a preferred formulary position

11  absent the rebates; and

12        h.     The extent to which the rebating scheme would force plan members to

13  incur additional expenses for their EpiPen prescriptions.

14      122.    Mylan alone could not have accomplished the purpose of the EpiPen Pricing

15  Enterprise, without the assistance of the PBMs.  For Mylan to profit from the scheme, the PBMs

16  needed to convince health care payers and plan sponsors to select their formulary, on which

17  EpiPen was given favorable treatment.  And the PBMs did so through misrepresentations:  they

18  told clients, potential clients, and investors that they secured significant discounts.  However,

19  these discounts were only significant because the list prices were artificially inflated.  The

20  discounts were fictitious.  They were the result of a deliberate scheme to create large rebates

21  without lowering real prices.  Without these misrepresentations, the EpiPen Pricing Enterprise

22  could not have achieved its common purpose.

23      123.    The EpiPen Pricing Enterprise engaged in and affected interstate commerce

24  because, *inter alia*, it set the price of drugs that were sold to and utilized by thousands of class

25  members throughout the United States, its territories, the District of Columbia, and the

26  Commonwealth of Puerto Rico.

27      124.    The impacts of the EpiPen Pricing Enterprise's scheme are still in place—*i.e.*, the

28

COMPLAINT - 42
Case No.
010648.11 949197 V1

HB HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

increased spread between the EpiPen list price and the actual price of EpiPen is still being maintained, and increased. Consequently, PBMs make a profit on the spread between list price and the actual acquisition cost—*i.e.*, the rebates. Under this system, a higher spread results in increased profits to PBMs and pharmacies.

125. The foregoing evidenced that Mylan, CVS Caremark, Express Scripts, and OptumRx were each willing participants in the EpiPen Pricing Enterprise, had a common purpose and interest in the object of the scheme, and functioned within a structure designed to effectuate the Enterprise's purpose—*i.e.*, through Mylan's artificial inflation of the EpiPen list price, coupled with Mylan's and the PBMs' creation of substantial rebates, and the PBMs' misstatements to the drug-purchasing public that those rebates benefitted health care payer and consumers like Plaintiffs and the class.

## B.    Conduct of the EpiPen Pricing Enterprise

126. During the class period, Mylan exerted control over the EpiPen Pricing Enterprise and participated in the operation or management of the affairs of the EpiPen Pricing Enterprise, directly or indirectly, in the following ways:

      a.    Mylan selected and published the EpiPen list price;

      b.    Mylan periodically raised the EpiPen list price;[53]

      c.    Mylan granted to the PBMs substantial rebates representing discounts off the EpiPen list price in exchange for the PBMs' promise to give EpiPen exclusive, or at least favorable, formulary placement;

      d.    Mylan concealed from the public the amount and purpose of the rebates;

      e.    Mylan intended that the PBMs would (and did) distribute through the U.S. Mail and interstate wire facilities, promotional and other materials which claimed that rebates (such as those applied to EpiPen) saved health care payers and consumers like Plaintiffs and class members money on their prescription needs; and

---

[53] *See, e.g., In re Lupron Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d 148, 172 (D. Mass. 2003) (finding sufficient allegations of defendants' participation in the conduct of an association-in-fact enterprise where the defendants "collectively determined the price that [the enterprise] would charge doctors for [a drug]," and "set the published AWP thereby determining the spread").

f.      Mylan misrepresented to the public, through the publication of EpiPen's list price and did not disclose that the list price differed substantially from that negotiated by PBMs, that the EpiPen list price reflected or approximated EpiPen's actual cost.

127.    The scheme had a hierarchical decision-making structure that was headed by Mylan.  Mylan controlled the EpiPen list price, and doled out rebates to the PBMs in exchange for the PBMs' assurances that EpiPen would receive exclusive, or at least favorable, formulary placement.

128.    The PBMs also participated in the conduct of the affairs of the EpiPen Pricing Enterprise, directly or indirectly, in the following ways:

a.      The PBMs promised to, and did, confer on EpiPen exclusive or at least favorable formulary placement;

b.      The PBMs distribute through the U.S. Mail and interstate wire facilities, promotional and other materials which claimed that rebates (such as those applied to EpiPen) saved health care payers and consumers like Plaintiffs and class members money on their prescription needs; and

c.      The PBMs concealed the existence or amount of the rebates—including those given to their competitors—to further the fraudulent pricing scheme.

129.    The scheme devised and implemented by Mylan, as well as other members of the EpiPen Pricing Enterprise, amounted to a common course of conduct intended to (a) secure favorable formulary positioning for EpiPen; (b) entice health care payers to select one of the PBMs' formularies; and thereby (c) secure payment for prescriptions of EpiPen written by plan members' physicians.

**C.      Mylan's Pattern of Racketeering Activity**

130.    Mylan conducted and participated in the conduct of the affairs of the EpiPen Pricing Enterprise through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud.  The pattern of racketeering activity by the EpiPen Pricing Enterprise likely involved thousands of

HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

separate instances of use of the U.S. Mail or interstate wire facilities in furtherance of the unlawful EpiPen pricing scheme.  Each of these fraudulent mailings and interstate wire transmissions constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B).  Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), through which Mylan and the PBMs intended to defraud Plaintiffs, members of the class, and other intended victims.

131.    Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiffs and members of the class.  Mylan and the PBMs calculated and intentionally crafted the EpiPen pricing scheme to ensure their own profits remained high, without regard to the effect such pricing behavior had on Plaintiffs and members of the class who would be over-billed for EpiPen.  In designing and implementing the scheme, at all times Mylan was cognizant of the fact that those in the distribution chain who are not part of the industry rely on the integrity of the pharmaceutical companies and PBMs in setting list prices and establishing rebates.

132.    By intentionally and artificially inflating the EpiPen list price, and then subsequently failing to disclose such practices to the individual patients, health plans, and insurers, Mylan and the PBMs engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

133.    Mylan's and the PBMs' racketeering activities amounted to a common course of conduct, with a similar pattern and purpose, intended to deceive Plaintiffs and members of the class.  Each separate use of the U.S. Mail and/or interstate wire facilities employed by Mylan was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including Plaintiffs and members of the class.  Mylan has engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of its EpiPen Pricing Enterprise.

134.    The pattern of racketeering activity alleged herein and the EpiPen Pricing

HB  HAGENS BERMAN
1918 Eighth Avenue, Suite 3300 • Seattle, WA  98101
(206) 623-7292 • FAX (206) 623-0594

1 Enterprise are separate and distinct from each other. Likewise, Mylan is distinct from the

2 EpiPen Pricing Enterprise.

3      135. The pattern of racketeering activity alleged herein is continuing as of the date of

4 this complaint, and, upon information and belief, will continue into the future unless enjoined by

5 this Court.

6 **D. Mylan's Use of the U.S. Mail and Interstate Wire Facilities**

7      136. The EpiPen Pricing Enterprise engaged in and affected interstate commerce

8 because it engaged in the following activities across state boundaries: the transmission and

9 publication of false and misleading information concerning the EpiPen list price; the payment

10 from Mylan to the PBMs of substantial rebates off the list price; and transmission of false or

11 incomplete statements intended to mislead health care payers and consumers regarding the

12 existence, amount, and purpose of the rebates.

13      137. During the class period, the EpiPen Pricing Enterprise's unlawful conduct and

14 wrongful practices were carried out by an array of employees, working across state boundaries,

15 who necessarily relied upon frequent transfers of documents, information, products, and funds by

16 the U.S. Mail and interstate wire facilities.

17      138. The nature and pervasiveness of the EpiPen pricing fraud scheme, which was

18 orchestrated out of the corporate headquarters of Mylan and each PBM, necessarily required

19 those headquarters to communicate directly and frequently by U.S. Mail and interstate wire

20 facilities.

21      139. Many of the precise dates of the EpiPen Pricing Enterprise's uses of the U.S. Mail

22 and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud)

23 have been hidden and cannot be alleged without access to Mylan's, CVS Caremark's, Express

24 Scripts's, and OptumRx's books and records. Indeed, an essential part of the successful

25 operation of the EpiPen Pricing Enterprise alleged herein depended upon secrecy. However,

26 Plaintiffs can generally describe the occasions on which the RICO predicate acts of mail fraud

27 and wire fraud occurred, and how those acts were in furtherance of the scheme; Plaintiffs

28

describe this below.

140.     Mylan's use of the U.S. Mail and interstate wire facilities to perpetrate the EpiPen pricing fraud scheme involved thousands of communications throughout the class period including, *inter alia*:

      a.     Marketing materials about Mylan's EpiPen product and its price, which Mylan sent to health care payers and health care providers located across the country;

      b.     Written communications between Mylan and the publishers of list price compendia regarding the EpiPen list price and its subsequent mark-ups, which occurred on a regular basis each year;

      c.     Written representations and telephone calls between Mylan and CVS Caremark regarding EpiPen markups and list price;

      d.     Written representations and telephone calls between Mylan and Express Scripts regarding EpiPen markups and list price;

      e.     Written representations and telephone calls between Mylan and OptumRx regarding EpiPen markups and list price;

      f.     Written representations and telephone calls between Mylan and CVS Caremark regarding EpiPen rebates;

      g.     Written representations and telephone calls between Mylan and Express Scripts regarding EpiPen rebates;

      h.     Written representations and telephone calls between Mylan and OptumRx regarding EpiPen rebates;

      i.     Hundreds of e-mails between Mylan and the PBMs agreeing to or effectuating the implementation of the EpiPen pricing fraud scheme;

      j.     Written and oral communications directed to U.S. Government agencies and private insurers that fraudulently misrepresented what the EpiPen list price was; the existence, amount, or purpose of the EpiPen rebates; and the true cost of EpiPen that were designed to conceal the scheme, deter investigations into EpiPen pricing, or forestall changes to

healthcare payers reimbursement of EpiPen prescriptions based on something other than the EpiPen list price; and

k.    Receipts of increased profits sent through the U.S. Mail and interstate wire facilities—the wrongful proceeds of the scheme.

141.    In addition to the above-referenced RICO predicate acts, it was foreseeable to Mylan that the PBMs would distribute publications through the U.S. Mail and by interstate wire facilities, and in those publications, claim that the increased rebates would benefit third-party payors and consumers like Plaintiffs and class members.

**E.    Damages Caused by Mylan's EpiPen Pricing Fraud**

142.    Mylan's violations of federal law and its pattern of racketeering activity have directly and proximately caused Plaintiffs and the class members to be injured in their business or property because Plaintiffs and class members have paid inflated out-of-pocket expenses for EpiPen.

143.    As described above, when a healthcare consumer fills a prescription for a drug like EpiPen, she is responsible for paying all or a portion of the medication's cost.  If the consumer is uninsured, she is responsible for 100% of the drug's cost.  If the consumer has a high-deductible health plan, she must pay for 100% of her drugs until she satisfies her deductible.  If the consumer's health plan contains a coinsurance requirement, she is responsible for paying a percentage of the drug's cost.  And if the consumer is a member of a Medicare Part D plan, her plan's contributions to the cost of the drug cuts out after a certain threshold is reached, saddling the consumer with a high percentage of her drug costs until she reaches her maximum contribution.

144.    The amount of each of these cash payments is based on the drug's list price. Therefore, when Mylan, through the EpiPen Pricing Enterprise, artificially inflates the EpiPen list price, it also artificially inflates the consumers' out-of-pocket expenses.

145.    Plaintiffs' injuries, and those of the class members, were proximately caused by Mylan's racketeering activity.  But for the misstatements made by Mylan and the PBMs and the

1    pricing scheme employed by the EpiPen Pricing Enterprise, Plaintiffs and others similarly

2    situated would have paid substantially less for their out-of-pocket EpiPen expenses.

3          146.    Plaintiffs' injuries were directly caused by Mylan's racketeering activity.  Drug

4    wholesalers, health care payers, and others in the pharmaceutical supply chain are not

5    responsible for cash payments (by those who have no insurance), coinsurance or deductible

6    payments (by private and public plan members), and payments made in the "Donut Hole" (for

7    Medicare members).  So, although the misstatements made by the PBMs in furtherance of the

8    EpiPen Pricing Enterprise were directed primarily to health care payers, those payers did not

9    have to make cash payments for the portions of prescription drugs costs that were, by definition,

10   excluded from their responsibility.  Therefore, the health care payers did not suffer the same

11   overcharges  alleged in this Complaint.

12         147.    And although the EpiPen Pricing Enterprise was effectuated to give Mylan a

13   wrongfully-obtained advantage over its competitors, the harm this suit seeks to remedy was not

14   suffered by Mylan's competitors.

15         148.    Plaintiffs and those similarly situated were most directly harmed by the fraud, and

16   there is no other Plaintiff or class of plaintiffs better situated to seek a remedy for the economic

17   harms to consumers from Mylan's fraudulent scheme.

18         149.    By virtue of these violations of 18 U.S.C. § 1962(c), Mylan is liable to Plaintiffs

19   for three times the damages Plaintiffs have sustained, plus the cost of this suit, including

20   reasonable attorneys' fees.

<div align="center">

**COUNT TWO**

**VIOLATION OF THE WASHINGTON CONSUMER PROTECTION ACT**

**(WASH. REV. CODE ANN. §§ 19.86.010, *ET SEQ.*)**

</div>

24         150.    Plaintiffs hereby incorporate by reference the allegations contained in the

25   preceding paragraphs of this complaint.

26         151.    This claim is brought by Plaintiffs on behalf of residents of Washington who are

27   members of the Class.

28

COMPLAINT - 49
Case No.

HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

152.    The Washington Consumer Protection Act ("Washington CPA") broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." WASH. REV. CODE. ANN. § 19.96.010.

153.    Defendant committed the acts complained of herein in the course of "trade" or "commerce" within the meaning of WASH. REV. CODE. ANN. § 19.96.010.

154.    Defendant is liable to Plaintiffs for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages, as well as any other remedies the Court may deem appropriate under WASH. REV. CODE. ANN. § 19.86.090.

## COUNT THREE

## VIOLATION OF THE ALABAMA DECEPTIVE TRADE PRACTICES ACT

## (ALA. CODE § 8-19-1, *ET SEQ.*)

155.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

156.    This claim is brought by Plaintiffs on behalf of residents of Alabama who are members of the Class.

157.    The Alabama Deceptive Trade Practices Act ("Alabama DTPA") declares several specific actions to be unlawful, including: "(11) Making a false or misleading statement of fact concerning the reasons for, existence of, or amounts of, price reductions"; and "(27) engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce." ALA. CODE § 8-19-5.

158.    Plaintiffs and class members are "consumers" within the meaning of ALA. CODE . § 8-19-3(2).

159.    Plaintiffs, class members and Mylan are "persons" within the meaning of ALA. CODE § 8-19-3(3).

160.    Defendant was and is engaged in "trade or commerce" within the meaning of ALA. CODE § 8-19-3(8).

161.    Pursuant to Alabama Code § 8-19-10, Plaintiffs seek monetary relief against

HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

1    Defendant measured as the greater of (a) actual damages in an amount to be determined at trial

2    and (b) statutory damages in the amount of $100 for each plaintiff.

3        162.    Plaintiffs also seek an order enjoining Defendant's unfair, unlawful, and/or

4    deceptive practices, attorneys' fees, and any other just and proper relief available under ALA.

5    CODE . § 8-19-1, *et seq.*

6        163.    On March 31, 2017, Plaintiffs sent a letter complying with ALA. CODE  § 8-19-

7    10(e).  Because Defendant failed to remedy its unlawful conduct within the requisite time period,

8    Plaintiffs seek all damages and relief to which they are entitled.

<div align="center">

**COUNT FOUR**

**VIOLATION OF THE ALASKA UNFAIR TRADE PRACTICES
AND CONSUMER PROTECTION ACT**

**(ALASKA STAT. ANN. § 45.50.471, *ET SEQ.*)**

</div>

12       164.    Plaintiffs hereby incorporate by reference the allegations contained in the

13   preceding paragraphs of this complaint.

14       165.    This claim is brought by Plaintiffs on behalf of residents of Alaska who are

15   members of the Class.

16       166.    The Alaska Unfair Trade Practices and Consumer Protection Act ("Alaska CPA")

17   declared unfair methods of competition and unfair or deceptive acts or practices in the conduct of

18   trade or commerce unlawful, including "(10) making false or misleading statements of fact

19   concerning the reasons for, existence of, or amounts of price reductions" or "(12) using or

20   employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly

21   concealing, suppressing, or omitting a material fact with intent that others rely upon the

22   concealment, suppression or omission in connection with the sale or advertisement of goods or

23   services whether or not a person has in fact been misled, deceived or damaged."  ALASKA STAT.

24   ANN. § 45.50.471.

25       167.    Pursuant to ALASKA STAT. ANN. § 45.50.531, Plaintiffs seek monetary relief

26   against Defendant measured as the greater of (a) three times the actual damages in an amount to



1    be determined at trial or (b) $500 for each plaintiff.

2        168.    Plaintiffs also seek an order enjoining Defendant's unfair, unlawful, and/or

3    deceptive practices pursuant to ALASKA STAT. ANN. § 45.50.535(b)(1), attorneys' fees, and any

4    other just and proper relief available under the Alaska CPA.

5        169.    On March 31, 2017, Plaintiffs sent a letter complying with ALASKA STAT. ANN.

6    § 45.50.535(b)(1).

7                                **COUNT FIVE**

8            **VIOLATION OF THE ARIZONA CONSUMER FRAUD ACT**

9                **(ARIZ. REV. STAT. § 44-1521, *ET SEQ.*)**

10        170.    Plaintiffs hereby incorporate by reference the allegations contained in the

11    preceding paragraphs of this complaint.

12        171.    This claim is brought by Plaintiffs on behalf of residents of Arizona who are

13    members of the Class.

14        172.    The Arizona Consumer Fraud Act ("Arizona CFA") provides that "[t]he act, use

15    or employment by any person of any deception, deceptive act or practice, fraud . . . ,

16    misrepresentation, or concealment, suppression or omission of any material fact with intent that

17    others rely upon such concealment, suppression or omission, in connection with the sale . . . of

18    any merchandise whether or not any person has in fact been misled, deceived or damaged

19    thereby, is declared to be an unlawful practice."  ARIZ. REV. STAT. § 44-1522(A).

20        173.    Defendant, Plaintiffs, and class members are "persons" within the meaning of the

21    Arizona CFA, ARIZ. REV. STAT. § 44-1521(6).

22        174.    EpiPens are "merchandise" within the meaning of ARIZ. REV. STAT. § 44-1521(5).

23        175.    Defendant's conduct, as set forth above, occurred in the conduct of trade or

24    commerce.

25        176.    Pursuant to the Arizona CFA, Plaintiffs seek monetary relief against Defendant in

26    an amount to be determined at trial.  Plaintiffs also seek punitive damages because Defendant

27    engaged in aggravated and outrageous conduct with an evil mind.

28



HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

177.     Plaintiffs also seek an order enjoining Defendant's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arizona CFA.

## COUNT SIX

## VIOLATION OF THE ARKANSAS DECEPTIVE TRADE PRACTICES ACT

## (ARK. CODE ANN. § 4-88-101, *ET SEQ.*)

178.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

179.     This claim is brought by Plaintiffs on behalf of residents of Arkansas who are members of the Class.

180.     The Arkansas Deceptive Trade Practices Act ("Arkansas DTPA") prohibits "[d]eceptive and unconscionable trade practices," which include, but are not limited to, "[e]ngaging in any . . . unconscionable false, or deceptive act or practice in business, commerce, or trade." ARK. CODE ANN. § 4-88-107(a)(10).  The Arkansas DTPA also prohibits, in connection with the sale or advertisement of any goods, "1) the act, use, or employment by any person of any deception, fraud, or pretense; or (2) the concealment, suppression, or omission of any material fact with intent that other rely upon the concealment, suppression, or omission." ARK. CODE ANN. § 4-88-108.

181.     Defendant, Plaintiffs, and class members are "persons" within the meaning of ARK. CODE ANN. § 4-88-102(5).

182.     Each drug at issue constitutes "goods" within the meaning of ARK. CODE ANN. § 4-88-102(4).

183.     Plaintiffs seek monetary relief against Defendant in an amount to be determined at trial.  Plaintiffs also seek punitive damages because Defendant acted wantonly in causing Plaintiffs' and class members' injuries, or with such a conscious indifference to the consequences that malice may be inferred.

184.     Plaintiffs also seek an order enjoining Defendant's unfair, unlawful, and/or

COMPLAINT - 53
Case No.
010648.11  949197 V1



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1    deceptive practices, attorneys' fees, and any other just and proper relief available under the

2    Arkansas DTPA.

3                              **COUNT SEVEN**

4              **VIOLATION OF THE CALIFORNIA LEGAL REMEDIES ACT**

5                     **(CAL. CIV. CODE § 1750, *ET SEQ*.)**

6        185.    Plaintiffs hereby incorporate by reference the allegations contained in the

7    preceding paragraphs of this complaint.

8        186.    This claim is brought by Plaintiffs on behalf of residents of California who are

9    members of the Class.

10       187.    The California Legal Remedies Act ("CLRA") prohibits "unfair or deceptive acts

11   or practices undertaken by any person in a transaction intended to result or which results in the

12   sale or lease of goods or services to any consumer[.]"  CAL. CIV. CODE § 1770(a).

13       188.    Defendant is a "person" under CAL. CIV. CODE § 1761(c).

14       189.    Plaintiffs and class members are "consumers" as defined by CAL. CIV. CODE

15   § 1761(d), who purchased one or more prescriptions of each drug at issue.

16       190.    Plaintiffs seek injunctive relief under the CLRA.  On March 31, 2017, Plaintiffs

17   sent a demand letter pursuant to the CAL. CIV. CODE § 1782(d).

18       191.    Plaintiffs will seek, under CAL. CIV. CODE § 1780(a), monetary relief against

19   Defendant for the harm caused by Defendant's violations of the CLRA as alleged herein, but will

20   do so thirty days after this complaint.

21       192.    Under CAL. CIV. CODE § 1780(b), Plaintiffs seek an additional award against

22   Defendant of up to $5,000 for each plaintiff or class member who qualifies as a "senior citizen"

23   or "disabled person" under the CLRA.  Defendant knew or should have known that its conduct

24   was directed to one or more Plaintiffs or class members who are senior citizens or disabled

25   persons.  Defendant's conduct caused one or more of these senior citizens or disabled persons to

26   suffer a substantial loss of property set aside for retirement or for personal or family care and

27   maintenance, or assets essential to the health or welfare of the senior citizen or disabled person.

28

HB  HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

1    One or more Plaintiffs or class members who are senior citizens or disabled persons are

2    substantially more vulnerable to Defendant's conduct because of age, poor health or infirmity,

3    impaired understanding, restricted mobility, or disability, and each of them suffered substantial

4    physical, emotional, or economic damage resulting from Defendant's conduct.

5    193.    Plaintiffs will amend to seek these damages thirty days after this action has been

6    filed.

7    194.    Plaintiffs further seek an order enjoining Defendant's unfair or deceptive acts or

8    practices, restitution, costs of court, and attorneys' fees pursuant to CAL. CIV. CODE § 1780(e),

9    and any other just and proper relief available under the CLRA.

10    195.    Plaintiffs sent a letter complying with CAL. CIV. CODE § 1780(b) on March 31,

11    2017.

12    ### COUNT EIGHT

13    ### VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW

14    ### (CAL. BUS. & PROF. CODE § 17200, *ET SEQ.*)

15    196.    Plaintiffs hereby incorporate by reference the allegations contained in the

16    preceding paragraphs of this complaint.

17    197.    This claim is brought by Plaintiffs on behalf of residents of California who are

18    members of the Class.

19    198.    California Business and Professions Code § 17200 (the "Unfair Competition

20    Law," or "UCL") prohibits "unlawful, unfair, or fraudulent business acts or practices."

21    Defendant violated the "unlawful" prong of § 17200 by their violations of the CLRA, CAL. CIV.

22    CODE § 1750, *et seq.*, as described above.  Defendant also violated the "fraudulent" prong of

23    § 17200 through their pricing fraud, as described throughout this complaint.  And Defendant

24    violated the "unfair" prong of § 17200 because the acts and practices set forth in this complaint,

25    including artificially inflating list prices to offer large rebates to the PBMs caused Defendant and

26    the PBMs to profit at the expense of consumers, and the harm caused to consumers greatly

27    outweighs any benefits associated with those practices.

28

COMPLAINT - 55
Case No.

199.     Defendant's actions, as set forth above, occurred within the conduct of their business, and in trade or commerce.

200.     Plaintiffs request that this Court enter such orders or judgments as may be necessary, including a declaratory judgment that Defendant has violated the UCL; an order enjoining Defendant from continuing its unfair, unlawful and/or fraudulent trade practices; an order restoring to Plaintiffs any money lost as result of Defendant's unfair, unlawful, and/or fraudulent trade practices, including restitution and disgorgement of any profits Defendant received as a result of its unfair, unlawful, or fraudulent practices, as provided in CAL. BUS. & PROF. CODE § 17203, CAL. CIV. PROC. CODE § 384, and CAL. CIV. CODE § 3345; and for any other relief as may be just and proper.

## COUNT NINE

## VIOLATION OF THE COLORADO CONSUMER PROTECTION ACT
### (COLO. REV. STAT. § 6-1-101, *ET SEQ.*)

201.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

202.     This claim is brought by Plaintiffs on behalf of residents of Colorado who are members of the Class.

203.     The Colorado Consumer Protection Act ("Colorado CPA") prohibits deceptive practices in the course of a person's business including, but not limited to, "mak[ing] false or misleading statements of fact concerning the price of goods, services, or property or the reasons for, existence of, or amounts of price reductions"; and "fail[ing] to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction." COLO. REV. STAT. § 6-1-105.

204.     Defendant is a "person" under COLO. REV. STAT. § 6-1-102(6).

205.     Plaintiffs and class members are "consumers" for purposes of Col. Rev. Stat § 6-1-113(1)(a).

HB   HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

206.    Defendant's conduct, as set forth above, occurred in the conduct of trade or commerce.

207.    Pursuant to COLO. REV. STAT. § 6-1-113, Plaintiffs seek monetary relief against Defendant measured as the greater of (a) actual damages in an amount to be determined at trial and discretionary trebling of such damages, or (b) statutory damages in the amount of $500 for each plaintiff or class member.

208.    Plaintiffs also seek an order enjoining Defendant's unfair, unlawful, or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper remedy under the Colorado CPA.

## COUNT TEN

## VIOLATION OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT
### (CONN. GEN. STAT. § 42-110A, *ET SEQ.*)

209.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

210.    This claim is brought by Plaintiffs on behalf of residents of Connecticut who are members of the Class.

211.    The Connecticut Unfair Trade Practices Act ("Connecticut UTPA") provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." CONN. GEN. STAT. § 42-110b(a).

212.    Defendant is a "person" within the meaning of CONN. GEN. STAT. § 42-110a(3).

213.    Defendant's challenged conduct occurred in "trade" or "commerce" within the meaning of CONN. GEN. STAT. § 42-110a(4).

214.    Plaintiffs and class members are entitled to recover their actual damages, punitive damages, and attorneys' fees pursuant to CONN. GEN. STAT. § 42-110g.

215.    Defendant acted with reckless indifference to another's rights, or wanton or intentional violation of another's rights and otherwise engaged in conduct amounting to a particularly aggravated, deliberate disregard for the rights and safety of others.  Therefore,

HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

1    punitive damages are warranted.

2    ## COUNT ELEVEN

3    ## VIOLATION OF THE DELAWARE CONSUMER FRAUD ACT

4    ## (DEL. CODE ANN. TIT. 6, § 2513, *ET SEQ.*)

5    216.    Plaintiffs hereby incorporate by reference the allegations contained in the

6    preceding paragraphs of this complaint.

7    217.    This claim is brought by Plaintiffs on behalf of residents of Delaware who are

8    members of the Class.

9    218.    The Delaware Consumer Fraud Act ("Delaware CFA") prohibits the "act, use, or

10   employment by any person of any deception, fraud, false pretense, false promise,

11   misrepresentation, or the concealment, suppression, or omission of any material fact with intent

12   that others rely upon such concealment, suppression, or omission, in connection with the sale,

13   lease or advertisement of any merchandise, whether or not any person has in fact been misled,

14   deceived, or damaged thereby." DEL. CODE ANN. tit. 6, § 2513(a).

15   219.    Defendant is a "person" within the meaning of DEL. CODE ANN. tit. 6, § 2511(7).

16   220.    Defendant's actions, as set forth above, occurred in the conduct of trade or

17   commerce.

18   221.    Plaintiffs seek damages under the Delaware CFA for injury resulting from the

19   direct and natural consequences of Defendant's unlawful conduct.  *See, e.g.*, *Stephenson v.

20   Capano Dev., Inc.*, 462 A.2d 1069, 1077 (Del. 1980).  Plaintiffs also seek an order enjoining

21   Defendant's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and

22   any other just and proper relief available under the Delaware CFA.

23   222.    Defendant engaged in gross, oppressive, or aggravated conduct justifying the

24   imposition of punitive damages.

25

26

27

28

COMPLAINT - 58
Case No.

HB HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

**COUNT TWELVE**

**VIOLATION OF THE D.C. CONSUMER PROTECTION PROCEDURES ACT**

**(D.C. CODE § 28-3901, *ET SEQ*.)**

223.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

224.    This claim is brought by Plaintiffs on behalf of residents of the District of Columbia who are members of the Class.

225.    The Consumer Protection Procedures Act ("District of Columbia CPPA") states: "it shall be a violation of this chapter, whether or not any consumer is in fact misled, deceived or damaged thereby, for any person to," *inter alia*, "(f) fail to state a material fact if such failure tends to mislead"; "(f-1) [u]se innuendo or ambiguity as to a material fact, which has a tendency to mislead"; "(j) make false or misleading representations of fact concerning the reasons for, existence of, or amounts of price reductions, or the price in comparison to price of competitors or one's own price at a past or future time"; or "(l) falsely state the reasons for offering or supplying goods or services at sale or discount prices."  D.C. CODE § 28-3904.

226.    Defendant is a "person" under D.C. CODE § 28-3901(a)(1).

227.    Plaintiffs and class members are "consumers," as defined by D.C. CODE § 28-3901(1)(2), who purchased the drugs at issue.

228.    Defendant's actions as set forth in this complaint constitute "trade practices" under D.C. CODE § 28-3901.

229.    Plaintiffs and class members are entitled to recover treble damages or $1500, whichever is greater, punitive damages, reasonable attorneys' fees, and any other relief the court deems proper, under D.C. CODE § 28-3901.

230.    Plaintiffs seek punitive damages against Defendant because Defendant's conduct evidences malice and/or egregious conduct.  Defendant misrepresented the actual price of these drugs, inflated the list price, and concealed the reasons for and amount of the rebates offered to PBMs in order to increase its profits at the expense of consumers.  It manipulated the price of its

COMPLAINT - 59
Case No.
010648.11  949197 V1

HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

life-saving product without regard to the impact of its scheme on consumers' ability to afford to buy a product necessary to sustain their life. Defendant's conduct constitutes malice warranting punitive damages.

## COUNT THIRTEEN

## VIOLATION OF THE FLORIDA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT

### (FLA. STAT. § 501.201, *ET SEQ.*)

231.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

232.    This claim is brought by Plaintiffs on behalf of residents of Florida who are members of the Class.

233.    The Florida Unfair and Deceptive Trade Practices Act ("FUDTPA") prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." FLA. STAT. § 501.204(1).

234.    Plaintiffs and class members are "consumers" within the meaning of FLA. STAT. § 501.203(7).

235.    Defendant engaged in "trade or commerce" within the meaning of FLA. STAT. § 501.203(8).

236.    Plaintiffs are entitled to recover their actual damages under FLA. STAT. § 501.211(2) and attorneys' fees under FLA. STAT. § 501.2105(1).

237.    Plaintiffs also seek an order enjoining Defendant's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the FUDTPA.

## COUNT FOURTEEN

## VIOLATION OF THE GEORGIA FAIR BUSINESS PRACTICES ACT

### (GA. CODE ANN. § 10-1-390, *ET SEQ.*)

238.    Plaintiffs hereby incorporate by reference the allegations contained in the



1  preceding paragraphs of this complaint.

2       239.    On March 31, 2017, Plaintiffs sent a letter complying with GA. CODE ANN. § 10-

3  1-399(b).  Plaintiffs will amend to add claims within thirty days after this letter was sent.

4  **COUNT FIFTEEN**

5  **VIOLATION OF THE GEORGIA UNIFORM DECEPTIVE TRADE PRACTICES ACT**

6  **(GA. CODE ANN § 10-1-370, *ET SEQ.*)**

7       240.    Plaintiffs hereby incorporate by reference the allegations contained in the

8  preceding paragraphs of this complaint.

9       241.    Georgia's Uniform Deceptive Trade Practices Act ("Georgia UDTPA") prohibits

10  "deceptive trade practices," which include "[m]ak[ing] false or misleading statements of fact

11  concerning the reasons for, existence of, or amounts of price reductions" or "any other conduct

12  which similarly creates a likelihood of confusion or of misunderstanding."  Ga. Code Ann

13  § 10-1-372(a).

14       242.    Defendant, Plaintiffs, and class members are "persons" within the meaning of GA.

15  CODE ANN. § 10-1-371(5).

16       243.    Plaintiffs seek an order enjoining Defendant's unfair, unlawful, and/or deceptive

17  practices, attorneys' fees, and any other just and proper relief available under GA. CODE ANN.

18  § 10-1-373.

19  **COUNT SIXTEEN**

20  **VIOLATION OF THE HAWAII ACT § 480-2(A)**

21  **(HAW. REV. STAT. § 480, *ET SEQ.*)**

22       244.    Plaintiffs hereby incorporate by reference the allegations contained in the

23  preceding paragraphs of this complaint.

24       245.    This claim is brought by Plaintiffs on behalf of residents of Hawaii who are

25  members of the Class.

26       246.    HAW. REV. STAT. § 480-2(a) prohibits "unfair methods of competition and unfair

27  or deceptive acts or practices in the conduct of any trade or commerce."

28

HB  HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

247. Defendant is a "person" under HAW. REV. STAT. § 480-1.

248. Plaintiffs and class members are "consumer[s]" as defined by HAW. REV. STAT. § 480-1, who purchased EpiPens.

249. Pursuant to HAW. REV. STAT. § 480-13, Plaintiffs seek monetary relief against Defendant measured as the greater of (a) $1000 and (b) threefold actual damages in an amount to be determined at trial.

250. Under HAW. REV. STAT. § 480-13.5, Plaintiffs seek an additional award against Defendant of up to $10,000 for each violation directed at a Hawaii elder. Defendant knew or should have known that its conduct was directed to one or more Class members who are elders. Defendant's conduct caused one or more of these elders to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the elder. Class members who are elders are substantially more vulnerable to Defendant's conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and each of them suffered a substantial physical, emotional, or economic damage resulting from Defendant's conduct.

## COUNT SEVENTEEN

## VIOLATION OF THE IDAHO CONSUMER PROTECTION ACT

### (IDAHO CODE ANN. § 48-601, *ET SEQ.*)

251. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

252. This claim is brought by Plaintiffs on behalf of residents of Idaho who are members of the Class.

253. The Idaho Consumer Protection Act ("Idaho CPA") prohibits deceptive business practices, including, but not limited to, "(11) [m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions"; "(17) [e]ngaging in any act or practice which is otherwise misleading, false, or deceptive to the consumer"; or "(18) engaging in any unconscionable method, act or practice in the conduct of trade or

HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

1    commerce," IDAHO CODE ANN. § 48-603.

2        254.    Defendant is a "person" under IDAHO CODE ANN. § 48-602(1).

3        255.    Defendant's acts or practices as set forth above occurred in the conduct of "trade"

4    or "commerce" under IDAHO CODE ANN. § 48-602(2).

5        256.    Pursuant to IDAHO CODE ANN. § 48-608, Plaintiffs seek monetary relief against

6    Defendant measured as the greater of (a) actual damages in an amount to be determined at trial

7    and (b) statutory damages in the amount of $1000 for each plaintiff.

8        257.    Plaintiffs also seek an order enjoining Defendant's unfair, unlawful, and/or

9    deceptive practices, attorneys' fees, and any other just and proper relief available under the Idaho

10   CPA.

11       258.    Plaintiffs also seek punitive damages against Defendant because Defendant's

12   conduct evidences an extreme deviation from reasonable standards.  Defendant flagrantly,

13   maliciously, and fraudulently misrepresented the actual cost of EpiPen and the existence,

14   purpose, and amount of the rebates granted to the PBMs; and concealed facts that only it knew.

15   Defendant's unlawful conduct constitutes malice, oppression and fraud warranting punitive

16   damages.

## COUNT EIGHTEEN

### VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT

### (815 ILL. COMP. STAT. 505/1, *ET SEQ.*, AND 720 ILL. COMP. STAT. 295/1A)

259.    Plaintiffs hereby incorporate by reference the allegations contained in the

preceding paragraphs of this complaint.

260.    This claim is brought by Plaintiffs on behalf of residents of Illinois who are

members of the Class.

261.    The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois

CFA") prohibits "unfair or deceptive acts or practices, including, but not limited to, the use of

employment of any deception, fraud, false pretense, tales promise, misrepresentation or the


1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of trade or commerce . . . whether any person has in fact been misled, deceived, or damaged thereby." 815 ILL. COMP. STAT. 505/2.

262.    Defendant is a "person" as that term is defined in 815 ILL. COMP. STAT. 505/1(c).

263.    Plaintiffs and class members are "consumers" as that term is defined in 815 ILL. COMP. STAT. 505/1(e).

264.    Pursuant to 815 ILL. COMP. STAT. 505/10a(a), Plaintiffs seek monetary relief against Defendant in the amount of actual damages as well as punitive damages because Defendant acted with fraud and/or malice and/or was grossly negligent.

265.    Plaintiffs also seek an order enjoining Defendant's unfair and/or deceptive acts or practices, attorneys' fees, and any other just and proper relief available under 815 ILL. COMP. STAT. 505/1, *et seq.*

## COUNT NINETEEN

## VIOLATION OF THE INDIANA DECEPTIVE CONSUMER SALES ACT

## (IND. CODE § 24-5-0.5-3)

266.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

267.    This claim is brought by Plaintiffs on behalf of residents of Indiana who are members of the Class.

268.    Indiana's Deceptive Consumer Sales Act ("Indiana DCSA") prohibits a person from engaging in "deceptive business practice[s]" or acts, including but not limited to representations that "a specific price advantage exists as to such subject of a consumer transaction, if it does not and if the supplier knows or should reasonably know that it does not." IND. CODE § 24-5-0.5-3(b).

269.    Defendant is a "person" within the meaning of IND. CODE § 25-5-0.5-2(a)(2), and a "supplier" within the meaning of IND. CODE § 24-5-0.5-2(a)(3).

HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

270.     Plaintiffs' payments for EpiPens are "consumer transactions" within the meaning of IND. CODE § 24-5-0.5-2(a)(3).

271.     Pursuant to IND. CODE § 24-5-0.5-4, Plaintiffs seek monetary relief against Defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each plaintiff, including treble damages up to $1000 for Defendant's willfully deceptive acts.

272.     Plaintiffs also seek punitive damages based on the outrageousness and recklessness of Defendant's conduct.

273.     On March 31, 2017, Plaintiffs sent a letter complying with IND. CODE § 24-5-0.5-5(a).  Because Defendant failed to remedy its unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which they are entitled.

<div align="center">

**COUNT TWENTY**

**VIOLATION OF THE IOWA PRIVATE RIGHT OF ACTION FOR CONSUMER FRAUDS ACT**

**(IOWA CODE § 714H.1, *ET SEQ.*)**

</div>

274.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

275.     This claim is brought by Plaintiffs on behalf of residents of Iowa who are members of the Class.

276.     The Iowa Private Right of Action for Consumer Frauds Act ("Iowa CFA") prohibits any "practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression or omission in connection with the advertisement, sale, or lease of consumer merchandise."  Iowa Code § 714H.3.

277.     Defendant is a "person" under Iowa Code § 714H.2(7).



278.    Plaintiffs and class members are "consumers" as defined by Iowa Code § 714H.2(3), who purchased EpiPens.

279.    Pursuant to Iowa Code § 714H.5, Plaintiffs seek an order enjoining Defendant's unfair and/or deceptive acts or practices; actual damages; and statutory damages up to three times the amount of actual damages awarded as a result of Defendant's willful and wanton disregard for the rights and safety of others; attorneys' fees; and other such equitable relief as the court deems necessary to protect the public from further violations of the Iowa CFA.

## COUNT TWENTY-ONE

## VIOLATION OF THE KANSAS CONSUMER PROTECTION ACT

## (KAN. STAT. ANN. § 50-623, *ET SEQ.*)

280.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

281.    This claim is brought by Plaintiffs on behalf of residents of Kansas who are members of the Class.

282.    The Kansas Consumer Protection Act ("Kansas CPA") states "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction." KAN. STAT. ANN. § 50-626(a).  Deceptive acts or practices include, but are not limited to, "the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact"; "the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact"; and "making false or misleading representations, knowingly or with reason to know, of fact concerning the reason for, existence of or amounts of price reductions," "whether or not any consumer has in fact been misled."  KAN. STAT. ANN. § 50-626.

283.    Plaintiffs and class members are "consumers" within the meaning of KAN. STAT. ANN. § 50-624(b), who purchased EpiPens.

284.    The sale of EpiPen to Plaintiffs was a "consumer transaction" within the meaning of KAN. STAT. ANN. § 50-624(c).

285.    Pursuant to KAN. STAT. ANN. § 50-634, Plaintiffs seek monetary relief against



1   Defendant measured as the greater of (a) actual damages in an amount to be determined at trial

2   and (b) statutory damages in the amount of $10,000 for each plaintiff.

3       286.    Plaintiffs also seek an order enjoining Defendant's unfair, unlawful, and/or

4   deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief

5   available under KAN. STAT. ANN. § 50-623, *et seq.*

6                              **COUNT TWENTY-TWO**

7          **VIOLATION OF THE KENTUCKY CONSUMER PROTECTION ACT**

8                   **(KY. REV. STAT. ANN. § 367.110, *ET SEQ.*)**

9       287.    Plaintiffs hereby incorporate by reference the allegations contained in the

10  preceding paragraphs of this complaint.

11      288.    This claim is brought by Plaintiffs on behalf of residents of Kentucky who are

12  members of the Class.

13      289.    The Kentucky Consumer Protection Act ("Kentucky CPA") makes unlawful

14  "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or

15  commerce . . . ." KY. REV. STAT. ANN. § 367.170(1).

16      290.    Defendant, Plaintiffs, and Class members are "persons" within the meaning of

17  KY. REV. STAT. ANN. § 367.110(1).

18      291.    Defendant engaged in "trade" or "commerce" within the meaning of KY. REV.

19  STAT. ANN. § 367.110(2).

20      292.    Pursuant to KY. REV. STAT. ANN. § 367.220, Plaintiffs seek to recover actual

21  damages in an amount to be determined at trial; an order enjoining Defendant's unfair, unlawful,

22  and/or deceptive practices; declaratory relief; attorneys' fees and any other just and proper relief

23  available under KY. REV. STAT. ANN. § 367.220.

24

25

26

27

28



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## COUNT TWENTY-THREE

### VIOLATION OF THE LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW

### (LA. REV. STAT. ANN. § 51:1401, *ET SEQ.*)

293.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

294.     This claim is brought by Plaintiffs on behalf of residents of Louisiana who are members of the Class.

295.     The Louisiana Unfair Trade Practices and Consumer Protection Law ("Louisiana CPL") makes unlawful "deceptive acts or practices in the conduct of any trade or commerce." LA. REV. STAT. ANN. § 51:1405(A).

296.     Defendant, Plaintiffs, and class members are "persons" within the meaning of LA. REV. STAT. ANN. § 51:1402(8).

297.     Plaintiffs and class members are "consumers" within the meaning of LA. REV. STAT. ANN. § 51:1402(1).

298.     Defendant engaged in "trade" or "commerce" within the meaning of LA. REV. STAT. ANN. § 51:1402(9).

299.     Pursuant to LA. REV. STAT. ANN. § 51:1409, Plaintiffs seek to recover actual damages in an amount to be determined at trial; treble damages for knowing violations of the Louisiana CPL; an order enjoining Defendant's unfair, unlawful, and/or deceptive practices; declaratory relief; attorneys' fees; and any other just and proper relief available under LA. REV. STAT. ANN. § 51:1409.

## COUNT TWENTY-FOUR

### VIOLATION OF THE MAINE UNFAIR TRADE PRACTICES ACT

### (ME. REV. STAT. ANN. TIT. 5, § 205-A, *ET SEQ.*)

300.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

COMPLAINT - 68
Case No.



HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

301.    This claim is brought by Plaintiffs on behalf of residents of Maine who are members of the Class.

302.    The Maine Unfair Trade Practices Act ("Maine UTPA") makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." ME. REV. STAT. ANN. tit. 5, § 207.

303.    Defendant, Plaintiffs, and class members are "persons" within the meaning of ME. REV. STAT. ANN. tit. § 5, 206(2).

304.    Defendant is engaged in "trade" or "commerce" within the meaning of ME. REV. STAT. ANN. tit. § 5, 206(3).

305.    Pursuant to ME. REV. STAT. ANN. tit. 5, § 213, Plaintiffs seek an order enjoining Defendant's unfair and/or deceptive acts or practices.

306.    On March 31, 2017, Plaintiffs sent a letter complying with ME. REV. STAT. ANN. tit. 5, § 213(1-A).  If Defendant fails to remedy its unlawful conduct within the requisite time period, Plaintiffs will seek all damages and relief to which they are entitled.

<div align="center">

**COUNT TWENTY-FIVE**

**VIOLATION OF THE MARYLAND CONSUMER PROTECTION ACT**

**(MD. CODE, COM. LAW § 13-101, *ET SEQ.*)**

</div>

307.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

308.    This claim is brought by Plaintiffs on behalf of residents of Maryland who are members of the Class.

309.    The Maryland Consumer Protection Act ("Maryland CPA") provides that a person may not engage in any unfair or deceptive trade practice in the sale or lease of any consumer good, including "failure to state a material fact if the failure deceives or tends to deceive;" "false or misleading representation[s] of fact which concern[] . . . [t]he reason of or the existence or amount of a price reduction;" and "[d]eception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with

COMPLAINT - 69
Case No.

HB HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

1   the intent that a consumer rely on the same," MD. CODE, COM. LAW § 13-301, regardless of

2   whether the consumer is actually deceived or damaged, Md. Code, Com. Law § 13-302.

3     310. Defendant, Plaintiffs, and class members are "persons" within the meaning of

4   MD. CODE, COM. LAW § 13-101(h).

5     311. Pursuant to MD. CODE, COM. LAW § 13-408, Plaintiffs seek actual damages,

6   attorneys' fees, and any other just and proper relief available under the Maryland CPA.

7   <center>COUNT TWENTY-SIX</center>

8   <center>VIOLATION OF THE MASSACHUSETTS GENERAL LAW CHAPTER 93(A)</center>

9   <center>(MASS. GEN. LAWS CH. 93A, § 1, *ET SEQ.*)</center>

10     312. Plaintiffs hereby incorporate by reference the allegations contained in the

11   preceding paragraphs of this complaint.

12     313. This Count is a placeholder only and will be formally asserted 30 days after a

13   demand letter was sent.

14     314. This claim is brought by Plaintiffs on behalf of residents of Massachusetts who

15   are members of the Class.

16     315. Massachusetts law (the "Massachusetts Act") prohibits "unfair or deceptive acts

17   or practices in the conduct of any trade or commerce." MASS. GEN. LAWS ch. 93A, § 2.

18     316. Defendant, Plaintiffs, and class members are "persons" within the meaning of

19   MASS. GEN. LAWS ch. 93A, § 1(a).

20     317. Defendant engaged in "trade" or "commerce" within the meaning of MASS. GEN.

21   LAWS ch. 93A, § 1(b).

22     318. Pursuant to MASS. GEN. LAWS ch. 93A, § 9, Plaintiffs will seek monetary relief

23   measured as the greater of (a) actual damages in an amount to be determined at trial and

24   (b) statutory damages in the amount of $25 for each plaintiff. Because Defendant's conduct was

25   committed willfully and knowingly, Plaintiffs are entitled to recover, for each plaintiff, up to

26   three times actual damages, but no less than two times actual damages.

27     319. Plaintiffs also seek an order enjoining Defendant's unfair and/or deceptive acts or

28

COMPLAINT - 70
Case No.

HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1    practices, punitive damages, and attorneys' fees, costs, and any other just and proper relief

2    available under the Massachusetts Act.

3        320.    On March 31, 2017, Plaintiffs sent a letter complying with MASS. GEN. LAWS ch.

4    93A, § 9(3).

**COUNT TWENTY-SEVEN**

**VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT**

**(MICH. COMP. LAWS § 445.903, *ET SEQ.*)**

8        321.    Plaintiffs hereby incorporate by reference the allegations contained in the

9    preceding paragraphs of this complaint.

10       322.    This claim is brought by Plaintiffs on behalf of residents of Michigan who are

11   members of the Class.

12       323.    The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair,

13   unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce,"

14   including "[m]aking false or misleading statements of fact concerning the reasons for, existence

15   of, or amounts of price reductions;" "[f]ailing to reveal a material fact, the omission of which

16   tends to mislead or deceive the consumer, and which fact could not reasonably be known by the

17   consumer;" "charging the consumer a price that is grossly in excess of the price at which similar

18   property or services are sold;" "[m]aking a representation of fact or statement of fact material to

19   the transaction such that a person reasonably believes the represented or suggested state of affairs

20   to be other than it actually is;" or "[f]ailing to reveal facts that are material to the transaction in

21   light of representations of fact made in a positive manner." MICH. COMP. LAWS § 445.903(1).

22       324.    Plaintiffs and class members are "person[s]" within the meaning of the MICH.

23   COMP. LAWS § 445.902(1)(d).

24       325.    Defendant is a "person" engaged in "trade or commerce" within the meaning of

25   the MICH. COMP. LAWS § 445.902(1)(d) and (g).

26       326.    Plaintiffs seek injunctive relief to enjoin Defendant from continuing its unfair and

27   deceptive acts; monetary relief against Defendant measured as the greater of (a) actual damages

HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

1  in an amount to be determined at trial and (b) statutory damages in the amount of $250 for each

2  plaintiff; reasonable attorneys' fees; and any other just and proper relief available under MICH.

3  COMP. LAWS § 445.911.

4         327.    Plaintiffs also seek punitive damages because Defendant carried out despicable

5  conduct with willful and conscious disregard of the rights and safety of others.  Defendant

6  maliciously and egregiously misrepresented actual price of EpiPens, inflated the list price, and

7  concealed the reasons for and amount of the rebates offered to PBMs in order to increase its

8  profits at the expense of consumers.  It manipulated the price of its life-saving product without

9  regard to the impact of its scheme on consumers' ability to afford to buy a product necessary to

10  sustain their life.  Defendant's conduct constitutes malice, oppression, and fraud warranting

11  punitive damages.

<div align="center">

**COUNT TWENTY-EIGHT**

**VIOLATION OF THE MINNESOTA PREVENTION OF CONSUMER FRAUD ACT**

**(MINN. STAT. § 325F.68, *ET SEQ*.)**

</div>

15         328.    Plaintiffs hereby incorporate by reference the allegations contained in the

16  preceding paragraphs of this complaint.

17         329.    This claim is brought by Plaintiffs on behalf of residents of Minnesota who are

18  members of the Class.

19         330.    The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits

20  "[t]he act, use, or employment by any person of any fraud, false pretense, false promise,

21  misrepresentation, misleading statement or deceptive practice, with the intent that others rely

22  thereon in connection with the sale of any merchandise, whether or not any person has in fact

23  been misled, deceived, or damaged thereby."  MINN. STAT. § 325F.69(1).

24         331.    Each purchase of an EpiPen constitutes "merchandise" within the meaning of

25  MINN. STAT. § 325F.68(2).

26         332.    Pursuant to MINN. STAT. § 8.31(3a), Plaintiffs seek actual damages, attorneys'

27  fees, and any other just and proper relief available under the Minnesota CFA.

28

HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

333.     Plaintiffs also seek punitive damages under MINN. STAT. § 549.20(1)(a) given the clear and convincing evidence that Defendant's acts show deliberate disregard for the rights or safety of others.

## COUNT TWENTY-NINE

## VIOLATION OF THE MINNESOTA DECEPTIVE TRADE PRACTICES ACT

### (MINN. STAT. § 325D.43-48, *ET SEQ.*)

334.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

335.     This claim is brought by Plaintiffs on behalf of residents of Minnesota who are members of the Class.

336.     The Minnesota Deceptive Trade Practices Act ("Minnesota DTPA") prohibits deceptive trade practices, which occur when a person "makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions" or "engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding."  MINN. STAT. § 325D.44.

337.     Pursuant to MINN. STAT. § 8.31(3a), Plaintiffs seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota CFA.

338.     Plaintiffs also seek punitive damages under MINN. STAT. § 549.20(1)(a) given the clear and convincing evidence that Defendant's acts show deliberate disregard for the rights or safety of others.

## COUNT THIRTY

## VIOLATION OF THE MISSISSIPPI CONSUMER PROTECTION ACT

### (MISS. CODE ANN. § 75-24-1, *ET SEQ.*)

339.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

340.     This claim is brought by Plaintiffs on behalf of residents of Mississippi who are members of the Class.

COMPLAINT - 73
Case No.



HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

341.    The Mississippi Consumer Protection Act ("Mississippi CPA") prohibits "unfair or deceptive trade practices in or affecting commerce." MISS. CODE ANN. § 75-24-5(1).  Unfair or deceptive practices include, but are not limited to, "[m]isrepresentations of fact concerning the reasons for, existence of, or amounts of price reductions." MISS. CODE ANN. § 75-24-5(2).

342.    Plaintiffs seek actual damages in an amount to be determined at trial any other just and proper relief available under the Mississippi CPA.

<div align="center">

**COUNT THIRTY-ONE**

**VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT**

**(MO. REV. STAT. § 407.010, *ET SEQ.*)**

</div>

343.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

344.    This claim is brought by Plaintiffs on behalf of residents of Missouri who are members of the Class.

345.    The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise." MO. REV. STAT. § 407.020.

346.    Defendant, Plaintiffs, and class members are "persons" within the meaning of MO. REV. STAT. § 407.010(5).

347.    Defendant engaged in "trade" or "commerce" in the State of Missouri within the meaning of MO. REV. STAT. § 407.010(7).

348.    Defendant is liable to Plaintiffs for damages in amounts to be proven at trial, including attorneys' fees, costs, and punitive damages, as well as injunctive relief enjoining Defendant's unfair and deceptive practices, and any other just and proper relief under MO. REV. STAT. § 407.025.

# COUNT THIRTY-TWO

## VIOLATION OF THE MONTANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT OF 1973

### (MONT. CODE ANN. § 30-14-101, *ET SEQ.*)

349.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

350.     This claim is brought by Plaintiffs on behalf of residents of Montana who are members of the Class.

351.     The Montana Unfair Trade Practices and Consumer Protection Act ("Montana CPA") makes unlawful any "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  MONT. CODE ANN. § 30-14-103.

352.     Defendant, Plaintiffs, and class members are "persons" within the meaning of MONT. CODE ANN. § 30-14-102(6).

353.     Plaintiffs and class members are "consumer[s]" under MONT. CODE ANN. § 30-14-102(1).

354.     The sale of each drug at issue occurred within "trade and commerce" within the meaning of MONT. CODE ANN. § 30-14-102(8), and Defendant committed deceptive and unfair acts in the conduct of "trade and commerce" as defined in that statutory section.

355.     Because Defendant's unlawful methods, acts, and practices have caused Plaintiffs to suffer an ascertainable loss of money and property, Plaintiffs seek from Defendant:  the greater of actual damages or $500; discretionary treble damages; and reasonable attorneys' fees.

356.     Plaintiffs additionally seek an order enjoining Defendant's unfair, unlawful, and/or deceptive practices, and any other relief the Court considers necessary or proper, under MONT. CODE ANN. § 30-14-133.



**COUNT THIRTY-THREE**

**VIOLATION OF THE NEBRASKA CONSUMER PROTECTION ACT**

**(NEB. REV. STAT. § 59-1601, *ET SEQ.*)**

357.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

358.    This claim is brought by Plaintiffs on behalf of residents of Nebraska who are members of the Class.

359.    The Nebraska Consumer Protection Act ("Nebraska CPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."  NEB. REV. STAT. § 59-1602.

360.    Defendant, Plaintiffs, and class members are "person[s]" under NEB. REV. STAT. § 59-1601(1).

361.    Defendant's actions as set forth herein occurred in the conduct of trade or commerce as defined under NEB. REV. STAT. § 59-1601(2).

362.    Because Defendant's conduct caused injury to Plaintiffs' property through violations of the Nebraska CPA, Plaintiffs seek recovery of actual damages, as well as enhanced damages up to $1,000, an order enjoining Defendant's unfair or deceptive acts and practices, costs of Court, reasonable attorneys' fees, and any other just and proper relief available under NEB. REV. STAT. § 59-1609.

**COUNT THIRTY-FOUR**

**VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT**

**(NEV. REV. STAT. § 598.0903, *ET SEQ.*)**

363.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

364.    This claim is brought by Plaintiffs on behalf of residents of Nevada who are members of the Class.

365.    The Nevada Deceptive Trade Practices Act ("Nevada DTPA") prohibits deceptive

HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

trade practices.  NEV. REV. STAT. § 598.0915 provides that a person engages in a "deceptive trade practice" if, in the course of business or occupation, the person:  "[m]akes false or misleading statements of fact concerning the price of goods or services for sale or lease, or the reasons for, existence of or amounts of price reductions;" "[k]nowingly makes any other false representation in a transaction;" "[f]ails to disclose a material fact in connection with the sale or lease of goods or services;" or "[m]akes an assertion of scientific, clinical or quantifiable fact in an advertisement which would cause a reasonable person to believe that the assertion is true, unless, at the time the assertion is made, the person making it has possession of factually objective scientific, clinical or quantifiable evidence which substantiates the assertion."  NEV. REV. STAT. §§ 598.0915–598.0925.

366.     Accordingly, Plaintiffs seek their actual damages, punitive damages, an order enjoining Defendant's deceptive acts or practices, costs of Court, attorney's fees, and all other appropriate and available remedies under the Nevada DTPA.  NEV. REV. STAT. § 41.600.

<div align="center">

**COUNT THIRTY-FIVE**

**VIOLATION OF THE NEW HAMPSHIRE
CONSUMER PROTECTION ACT**

**(N.H. REV. STAT. ANN. § 358-A:1, *ET SEQ.*)**

</div>

367.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

368.     This claim is brought by Plaintiffs on behalf of residents of New Hampshire who are members of the Class.

369.     The New Hampshire Consumer Protection Act ("New Hampshire CPA") prohibits a person, in the conduct of any trade or commerce, from "using any unfair or deceptive act or practice," including, "but . . . not limited to" "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions."  N.H. REV. STAT. ANN.§ 358-A:2.

370.     Defendant, Plaintiffs, and class members are "persons" under N.H. REV. STAT.

HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1   ANN. § 358-A:1.

2   371.   Defendant's actions as set forth herein occurred in the conduct of trade or

3   commerce as defined under N.H. REV. STAT. ANN. § 358-A:1.

4   372.   Because Defendant's willful conduct caused injury to Plaintiffs' property through

5   violations of the New Hampshire CPA, Plaintiffs seek recovery of actual damages or $1,000,

6   whichever is greater; treble damages; costs and reasonable attorneys' fees; an order enjoining

7   Defendant's unfair and/or deceptive acts and practices; and any other just and proper relief under

8   N.H. REV. STAT. ANN. § 358-A:10.

9   ## COUNT THIRTY-SIX

10   ## VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT

11   ## (N.J. STAT. ANN. § 56:8-1, *ET SEQ.*)

12   373.   Plaintiffs hereby incorporate by reference the allegations contained in the

13   preceding paragraphs of this complaint.

14   374.   This claim is brought by Plaintiffs on behalf of residents of New Jersey who are

15   members of the Class.

16   375.   The New Jersey Consumer Fraud Act ("New Jersey CFA") makes unlawful "[t]he

17   act, use or employment by any person of any unconscionable commercial practice, deception,

18   fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression

19   or omission of any material fact with the intent that others rely upon such concealment,

20   suppression or omission, in connection with the sale or advertisement of any merchandise or real

21   estate, or with the subsequent performance of such person as aforesaid, whether or not any

22   person has in fact been misled, deceived or damaged thereby…"  N.J. STAT. ANN. § 56:8-2.

23   376.   Defendant, Plaintiffs, and class members are "persons" within the meaning of N.J.

24   STAT. ANN. § 56:8-1(d).

25   377.   Defendant engaged in "sales" of "merchandise" within the meaning of N.J. STAT.

26   ANN. § 56:8-1(c), (d).

27   378.   Plaintiffs are entitled to recover legal and/or equitable relief, including an order

28

COMPLAINT - 78
Case No.

HAGENS BERMAN

1   enjoining Defendant's unlawful conduct, treble damages, costs, and reasonable attorneys' fees

2   pursuant to N.J. Stat. Ann. § 56:8-19, and any other just and appropriate relief.

### COUNT THIRTY-SEVEN

### VIOLATION OF THE NEW MEXICO UNFAIR TRADE PRACTICES ACT

### (N.M. STAT. ANN. §§ 57-12-1, *ET SEQ.*)

6       379.    Plaintiffs hereby incorporate by reference the allegations contained in the

7   preceding paragraphs of this complaint.

8       380.    This claim is brought by Plaintiffs on behalf of residents of New Mexico who are

9   members of the Class.

10       381.    The New Mexico Unfair Trade Practices Act ("New Mexico UTPA") makes

11   unlawful "a false or misleading oral or written statement, visual description or other

12   representation of any kind knowingly made in connection with the sale, lease, rental or loan of

13   goods or services … by a person in the regular course of the person's trade or commerce, that

14   may, tends to or does deceive or mislead any person," including, but not limited to, "failing to

15   state a material fact if doing so deceives or tends to deceive." N.M. STAT. ANN. § 57-12-2(D).

16       382.    Defendant, Plaintiffs, and class members are "person[s]" under N.M. STAT. ANN.

17   § 57-12-2.

18       383.    Defendant's actions as set forth herein occurred in the conduct of trade or

19   commerce as defined under N.M. STAT. ANN. § 57-12-2.

20       384.    Because Defendant's unconscionable, willful conduct caused actual harm to

21   Plaintiffs, Plaintiffs seek recovery of actual damages or $100, whichever is greater; discretionary

22   treble damages; punitive damages; and reasonable attorneys' fees and costs, as well as all other

23   proper and just relief available under N.M. STAT. ANN. § 57-12-10.

### COUNT THIRTY-EIGHT

### VIOLATION OF THE NEW YORK GENERAL BUSINESS LAW §§ 349-350

### (N.Y. GEN. BUS. LAW §§ 349-350)

27       385.    Plaintiffs hereby incorporate by reference the allegations contained in the



preceding paragraphs of this complaint.

386. This claim is brought by Plaintiffs on behalf of residents of New York who are members of the Class.

387. The New York General Business Law ("New York GBL") makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. GEN. BUS. LAW § 349.

388. Plaintiffs and class members are "persons" within the meaning of N.Y. GEN. BUS. LAW § 349(h).

389. Defendant is a "person," "firm," "corporation," or "association" within the meaning of N.Y. GEN. BUS. LAW § 349.

390. Defendant's deceptive acts and practices, which were intended to mislead consumers who purchased EpiPens, was conduct directed at consumers.

391. Because Defendant's willful and knowing conduct caused injury to Plaintiffs, Plaintiffs seek recovery of actual damages or $50, whichever is greater; discretionary treble damages up to $1,000; punitive damages; reasonable attorneys' fees and costs; an order enjoining Defendant's deceptive conduct; and any other just and proper relief available under N.Y. GEN. BUS. LAW § 349.

## COUNT THIRTY-NINE

### VIOLATION OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE ACTS AND PRACTICES ACT

### (N.C. GEN. STAT. § 75-1.1, *ET SEQ.*)

392. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

393. This claim is brought by Plaintiffs on behalf of residents of North Carolina who are members of the Class.

394. North Carolina's Unfair and Deceptive Acts and Practices Act (the "North Carolina Act") broadly prohibits "unfair or deceptive acts or practices in or affecting commerce."



HB HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1   N.C. GEN. STAT. § 75-1.1(a).

2   395.   Defendant engaged in "commerce" within the meaning of N.C. GEN. STAT.

3   § 75-1.1(b).

4   396.   Plaintiffs seek an order for treble their actual damages, an order enjoining

5   Defendant's unlawful acts, costs of Court, attorney's fees, and any other just and proper relief

6   available under the North Carolina Act, N.C. GEN. STAT. § 75-16.

7                                   **COUNT FORTY**

8          **VIOLATION OF THE NORTH DAKOTA CONSUMER FRAUD ACT**

9                            **(N.D. CENT. CODE § 51-15-02)**

10   397.   Plaintiffs hereby incorporate by reference the allegations contained in the

11   preceding paragraphs of this complaint.

12   398.   This claim is brought by Plaintiffs on behalf of residents of North Dakota who are

13   members of the Class.

14   399.   The North Dakota Consumer Fraud Act ("North Dakota CFA") makes unlawful

15   "[t]he act, use, or employment by any person of any deceptive act or practice, fraud, false

16   pretense, false promise, or misrepresentation, with the intent that others rely thereon in

17   connection with the sale or advertisement of any merchandise…." N.D. Cent. Code § 51-15-02.

18   400.   Defendant, Plaintiffs, and class members are "persons" within the meaning of

19   N.D. CENT. CODE § 51-15-02(4).

20   401.   Defendant's engaged in the "sale" of "merchandise" within the meaning of N.D.

21   CENT. CODE § 51-15-02(3), (5).

22   402.   Defendant knowingly committed the conduct described above, and thus, under

23   N.D. CENT. CODE § 51-15-09, Defendant is liable to Plaintiffs for treble damages in amounts to

24   be proven at trial, as well as attorneys' fees, costs, and disbursements.  Plaintiffs further seek an

25   order enjoining Defendant's unfair and/or deceptive acts or practices, and other just and proper

26   available relief under the North Dakota CFA.

27

28

COMPLAINT - 81
Case No.

HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

**COUNT FORTY-ONE**

**VIOLATION OF THE OHIO CONSUMER SALES PRACTICES ACT**

**(OHIO REV. CODE ANN. § 1345.01, *ET SEQ.*)**

403. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

404. This claim is brought by Plaintiffs on behalf of residents of Ohio who are members of the Class.

405. Ohio Consumer Sales Practices Act ("Ohio CSPA"), OHIO REV. CODE ANN. § 1345.02, broadly prohibits unfair or deceptive acts or practices in connection with a consumer transaction. Specifically, and without limitation of the broad prohibition, the Act prohibits suppliers from representing that "a specific price advantage exists, if it does not." OHIO REV. CODE ANN. § 1345.02.

406. Defendant is a "supplier" as that term is defined in OHIO REV. CODE ANN. § 1345.01(C).

407. Plaintiffs and class members are "consumers" as that term is defined in OHIO REV. CODE ANN. § 1345.01(D), and their purchases of EpiPens is a "consumer transaction" within the meaning of OHIO REV. CODE ANN. § 1345.01(A).

408. As a result of the foregoing wrongful conduct, Plaintiffs have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including, but not limited to, actual and statutory damages, an order enjoining Defendant's deceptive and unfair conduct, treble damages, court costs, and reasonable attorneys' fees, pursuant to OHIO REV. CODE ANN. § 1345.09, *et seq.*

**COUNT FORTY-TWO**

**VIOLATION OF THE OKLAHOMA CONSUMER PROTECTION ACT**

**(OKLA. STAT. TIT. 15, § 751, *ET SEQ.*)**

409. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

410.    This claim is brought by Plaintiffs on behalf of residents of Oklahoma who are members of the Class.

411.    The Oklahoma Consumer Protection Act ("Oklahoma CPA") declares unlawful, *inter alia*, the following acts or practices when committed in the course of business:  making a "misrepresentation, omission or other practice that has deceived or could reasonably be expected to deceive or mislead a person to the detriment of that person;" "any practice which offends established public policy or if the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers;" and making "false or misleading statements of fact, knowingly or with reason to know, concerning the price of the subject of a consumer transaction or the reason for, existence of, or amounts of price reduction."  OKLA. STAT. tit. 15, §§ 752-753.

412.    Plaintiffs and class members are "persons" under OKLA. STAT. tit. 15, § 752.

413.    Defendant is a "person," "corporation," or "association" within the meaning of OKLA. STAT. tit. 15, § 15-751(1).

414.    The sale of EpiPens to Plaintiffs was a "consumer transaction" within the meaning of OKLA. STAT. tit. 15, § 752, and Defendant's actions as set forth herein occurred in the conduct of trade or commerce.

415.    Plaintiffs seek punitive damages because Defendant's conduct was egregious. Defendant misrepresented the actual price of EpiPens, inflated the list price, and concealed the reasons for and amount of the rebates offered to PBMs in order to increase its profits at the expense of consumers.  It manipulated the price of its life-saving product without regard to the impact of its scheme on consumers' ability to afford to buy a product necessary to sustain their life.  Defendant's egregious conduct warrants punitive damages.

416.    Defendant's conduct as alleged herein was unconscionable because (1) Defendant knowingly or had reason to know, took advantage of consumers reasonably unable to protect their interests because of their age, physical infirmity, ignorance, illiteracy, inability to understand the language of an agreement or similar factor; (2) at the time the consumer transaction was entered into, Defendant knew or had reason to know that the price the consumers

COMPLAINT - 83
Case No.
010648.11  949197 V1

HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

1  were charged grossly exceeded the price at which similar products were readily obtainable in

2  similar transactions by like consumers; and (3) Defendant knew or had reason to know that the

3  transaction Defendant induced the consumers to enter into was excessively one-sided in favor of

4  Defendant.

5      417.    Because Defendant's unconscionable conduct caused injury to Plaintiffs,

6  Plaintiffs seek recovery of actual damages, discretionary penalties up to $2,000 per violation, and

7  reasonable attorneys' fees, under OKLA. STAT. tit. 15, § 761.1.  Plaintiffs further seek an order

8  enjoining Defendant's unfair and/or deceptive acts or practices, and any other just and proper

9  relief available under the Oklahoma CPA.

10                         **COUNT FORTY-THREE**

11      **VIOLATION OF THE OREGON UNLAWFUL TRADE PRACTICES ACT**

12                  **(OR. REV. STAT. § 646.605, *ET SEQ.*)**

13      418.    Plaintiffs hereby incorporate by reference the allegations contained in the

14  preceding paragraphs of this complaint.

15      419.    This claim is brought by Plaintiffs on behalf of residents of Oregon who are

16  members of the Class.

17      420.    The Oregon Unfair Trade Practices Act ("Oregon UTPA") prohibits a person

18  from, in the course of the person's business, doing any of the following:  "[m]ak[ing] false or

19  misleading representations of fact concerning the reasons for, existence of, or amounts of price

20  reductions;" "[m]ak[ing] false or misleading representations of fact concerning the offering price

21  or, or the person's cost for . . . goods;" or "[e]ngag[ing] in any other unfair or deceptive conduct

22  in trade or commerce."  OR. REV. STAT. § 646.608(1).

23      421.    Defendant is a person within the meaning of OR. REV. STAT. § 646.605(4).

24      422.    Each drug at issue are "goods" obtained primarily for personal family or

25  household purposes within the meaning of OR. REV. STAT. § 646.605(6).

26      423.    Plaintiffs are entitled to recover the greater of actual damages or $200 pursuant to

27  OR. REV. STAT. § 646.638(1).  Plaintiffs are also entitled to punitive damages because Defendant

28

HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

engaged in conduct amounting to a particularly aggravated, deliberate disregard of the rights of others.

## COUNT FORTY-FOUR

### VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW

### (73 PA. CONS. STAT. § 201-1, *ET SEQ.*)

424.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

425.    This claim is brought by Plaintiffs on behalf of residents of Pennsylvania who are members of the Class.

426.    The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including:  "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" and "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding."  73 PA. CONS. STAT. § 201-2(4).

427.    Defendant, Plaintiffs, and class members are "persons" within the meaning of 73 PA. CONS. STAT. § 201-2(2).

428.    Plaintiffs purchased EpiPens primarily for personal, family, or household purposes within the meaning of 73 PA. CONS. STAT. § 201-9.2.

429.    All of the acts complained of herein were perpetrated by Defendant in the course of trade or commerce within the meaning of 73 PA. CONS. STAT. § 201-2(3).

430.    Defendant is liable to Plaintiffs for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs.  73 PA. CONS. STAT. § 201-9.2(a).  Plaintiffs are also entitled to an award of punitive damages given that Defendant's conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.



HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

1

**COUNT FORTY-FIVE**

2

**VIOLATION OF THE RHODE ISLAND UNFAIR TRADE PRACTICES**
**AND CONSUMER PROTECTION ACT**

3

**(R.I. GEN. LAWS § 6-13.1, *ET SEQ*.)**

4

431.    Plaintiffs hereby incorporate by reference the allegations contained in the

5

preceding paragraphs of this complaint.

6

432.    This claim is brought by Plaintiffs on behalf of residents of Rhode Island who are

7

members of the Class.

8

433.    Rhode Island's Unfair Trade Practices and Consumer Protection Act ("Rhode

9

Island CPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or

10

commerce" including:  "[m]aking false or misleading statements of fact concerning the reasons

11

for, existence of, or amounts of price reductions;" "[e]ngaging in any other conduct that similarly

12

creates a likelihood of confusion or of misunderstanding;" "[e]ngaging in any act or practice that

13

is unfair or deceptive to the consumer;" and "[u]sing any other methods, acts or practices which

14

mislead or deceive members of the public in a material respect."  R.I. GEN. LAWS § 6-13.1-1(6).

15

434.    Defendant, Plaintiffs, and class members are "persons" within the meaning of R.I.

16

GEN. LAWS § 6-13.1-1(3).

17

435.    Defendant is engaged in "trade" and "commerce" within the meaning of R.I. GEN.

18

LAWS § 6-13.1-1(5).

19

436.    Plaintiffs purchased EpiPens primarily for personal, family, or household

20

purposes within the meaning of R.I. GEN. LAWS § 6-13.1-5.2(a).

21

437.    Plaintiffs are entitled to recover the greater of actual damages or $200 pursuant to

22

R.I. GEN. LAWS § 6-13.1-5.2(a).  Plaintiffs also seek punitive damages at the discretion of the

23

Court.

24

25

26

27

28

COMPLAINT - 86
Case No.



HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

**COUNT FORTY-SIX**

**VIOLATION OF THE SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT**

**(S.C. CODE ANN. § 39-5-10, *ET SEQ.*)**

438.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

439.    This claim is brought by Plaintiffs on behalf of residents of South Carolina who are members of the Class.

440.    The South Carolina Unfair Trade Practices Act ("South Carolina UTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." S.C. CODE ANN. § 39-5-20(a).

441.    Defendant is a "person" under S.C. CODE ANN. § 39-5-10.

442.    Pursuant to S.C. CODE ANN. § 39-5-140(a), Plaintiffs seek monetary relief to recover their economic losses.  Because Defendant's actions were willful and knowing, Plaintiffs' damages should be trebled.

443.    Plaintiffs further allege that Defendant's malicious and deliberate conduct warrants an assessment of punitive damages because Defendant carried out despicable conduct with willful and conscious disregard of the rights and safety of others, subjecting Plaintiffs to cruel and unjust hardship as a result.  Defendant misrepresented the actual price of EpiPens, inflated the list price, and concealed the reasons for and amount of the rebates offered to PBMs in order to increase its profits at the expense of consumers.  It manipulated the price of its life-saving product without regard to the impact of its scheme on consumers' ability to afford to buy a product necessary to sustain their life.  Defendant's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

444.    Plaintiffs further seek an order enjoining Defendant's unfair or deceptive acts or practices.

HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

1

**COUNT FORTY-SEVEN**

2

**VIOLATION OF THE SOUTH DAKOTA DECEPTIVE TRADE PRACTICES
AND CONSUMER PROTECTION LAW**

3

**(S.D. CODIFIED LAWS § 37-24-6)**

4

445.     Plaintiffs hereby incorporate by reference the allegations contained in the

5

preceding paragraphs of this complaint.

6

446.     This claim is brought by Plaintiffs on behalf of residents of South Dakota who are

7

members of the Class.

8

447.     The South Dakota Deceptive Trade Practices and Consumer Protection Law

9

("South Dakota CPL") prohibits deceptive acts or practices, which include "[k]nowingly

10

act[ing], us[ing], or employ[ing] any deceptive act or practice, fraud, false pretense, false

11

promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection

12

with the sale or advertisement of any merchandise, regardless of whether any person has in fact

13

been misled, deceived, or damaged thereby;" and "advertising price reductions without . . .

14

including in the advertisement the specific basis for the claim of a price reduction or [o]ffering

15

the merchandise for sale at the higher price from which the reduction is taken for at least seven

16

consecutive business days during the sixty-day period prior to the advertisement." S.D.

17

CODIFIED LAWS §§ 37-24-6(1), 37-24-31.

18

448.     Under S.D. CODIFIED LAWS § 37-24-31, Plaintiffs are entitled to a recovery of

19

their actual damages suffered as a result of Defendant's acts and practices.

20

**COUNT FORTY-EIGHT**

21

**VIOLATION OF THE TENNESSEE CONSUMER PROTECTION ACT**

22

**(TENN. CODE ANN. § 47-18-101, *ET SEQ.*)**

23

449.     Plaintiffs hereby incorporate by reference the allegations contained in the

24

preceding paragraphs of this complaint.

25

450.     This claim is brought by Plaintiffs on behalf of residents of Tennessee who are

26

members of the Class.

27

28

COMPLAINT - 88
Case No.



451.    Tennessee Consumer Protection Act ("Tennessee CPA") prohibits "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce," including, but not limited to, "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions."  TENN. CODE ANN. § 47-18-104.

452.    Plaintiffs and class members are "natural persons" and "consumers" within the meaning of TENN. CODE ANN. § 47-18-103(2).

453.    Defendant is a "person" within the meaning of TENN. CODE ANN. § 47-18-103(2).

454.    Defendant's conduct complained of herein affected "trade," "commerce," or "consumer transactions" within the meaning of TENN. CODE ANN. § 47-18-103(19).

455.    Pursuant to TENN. CODE ANN. § 47-18-109(a), Plaintiffs seek monetary relief against Defendant measured as actual damages in an amount to be determined at trial, treble damages as a result of Defendant's willful or knowing violations, and any other just and proper relief available under the Tennessee CPA.

## COUNT FORTY-NINE

### VIOLATION OF THE TEXAS DECEPTIVE TRADE PRACTICES CONSUMER PROTECTION ACT

### (TEX. BUS. & COM. CODE § 17.41, *ET SEQ.*)

456.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

457.    This claim is brought by Plaintiffs on behalf of residents of Texas who are members of the Class.

458.    On March 31, 2017, Plaintiffs sent a letter complying with TEX. BUS. & COM. CODE § 17.505(a).  Plaintiffs will add Texas DTPA claims on or before May 30, 2017.

## COUNT FIFTY

### VIOLATION OF THE UTAH CONSUMER SALE PRACTICES ACT

### (UTAH CODE ANN. § 13-11-1, *ET SEQ.*)

459.    Plaintiffs hereby incorporate by reference the allegations contained in the



preceding paragraphs of this complaint.

460.    This claim is brought by Plaintiffs on behalf of residents of Utah who are members of the Class.

461.    The Utah Consumer Sales Practices Act ("Utah CSPA") makes unlawful any "deceptive act or practice by a supplier in connection with a consumer transaction," including, but not limited to, "indicat[ing] that a specific price advantage exists, if it does not."  UTAH CODE ANN. § 13-11-4.  "An unconscionable act or practice by a supplier in connection with a consumer transaction" also violates the Utah CSPA.  UTAH CODE ANN. § 13-11-5.

462.    Defendant knew, or had reason to know, that consumers would rely on Defendant's reported list price as the price of EpiPens, and knew that, given the real list price spread that Defendant created, the EpiPen list price was not a fair or reasonable approximation of the actual cost of its active ingredient or the cost of manufacturing the auto-injector.  Defendant therefore engaged in an unconscionable act within the meaning of UTAH CODE ANN. § 13-11-5.

463.    Pursuant to UTAH CODE ANN. § 13-11-4, Plaintiffs seek monetary relief measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $2,000 for each Plaintiff; reasonable attorneys' fees; and any other just and proper relief available under the Utah CSPA.

## COUNT FIFTY-ONE

## VIOLATION OF THE VERMONT CONSUMER FRAUD ACT

### (VT. STAT. ANN. TIT. 9, § 2451 *ET SEQ.*)

464.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

465.    This claim is brought by Plaintiffs on behalf of residents of Vermont who are members of the Class.

466.    The Vermont Consumer Fraud Act ("Vermont CFA") makes unlawful "[u]nfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce…." VT. STAT. ANN. tit. 9, § 2453(a).

HB  HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

467. Defendant is a seller within the meaning of VT. STAT. ANN. tit. 9, § 2451(a)(c).

468. Plaintiffs are entitled to recover "appropriate equitable relief" and "the amount of [their] damages, or the consideration or the value of the consideration given by [them], reasonable attorney's fees, and exemplary damages not exceeding three times the value of the consideration given by [them]," pursuant to VT. STAT. ANN. tit. 9, § 2461(b).

## COUNT FIFTY-TWO

## VIOLATION OF THE VIRGINIA CONSUMER PROTECTION ACT

### (VA. CODE ANN. § 59.1-196, *ET SEQ.*)

469. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

470. This claim is brought by Plaintiffs on behalf of residents of Virginia who are members of the Class.

471. The Virginia Consumer Protection Act ("Virginia CPA") lists prohibited "practices" which include:  "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" and "[u]sing any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction."  VA. CODE ANN. § 59.1-200.

472. Defendant is a "supplier" under VA. CODE ANN. § 59.1-198.

473. Defendant's advertisement of the EpiPen list price was a "consumer transaction" within the meaning of VA. CODE ANN. § 59.1-198.

474. Pursuant to VA. CODE ANN. § 59.1-204, Plaintiffs seek monetary relief against Defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each Plaintiff.  Because Defendant's conduct was committed willfully and knowingly, Plaintiffs are entitled to recover, for each plaintiff, the greater of (a) three times actual damages or (b) $1,000.

475. Plaintiffs also seek an order enjoining Defendant's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available

HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

1  under VA. CODE ANN. § 59.1-204, *et seq.*

2  ## COUNT FIFTY-THREE

3  ## VIOLATION OF THE WEST VIRGINIA CONSUMER CREDIT
   ## AND PROTECTION ACT

4  ### (W. VA. CODE § 46A-1-101, *ET SEQ.*)

5  476.    Plaintiffs hereby incorporate by reference the allegations contained in the

6  preceding paragraphs of this complaint.

7  477.    This claim is brought by Plaintiffs on behalf of residents of West Virginia who are

8  members of the Class.

9  478.    On March 31, 2017, Plaintiffs sent a letter complying with W. VA. CODE § 46A-6-

10  106(b).  If Defendant fails to remedy its unlawful conduct within the requisite time period,

11  Plaintiffs will seek all damages and relief to which Plaintiffs are entitled.

12  ## COUNT FIFTY-FOUR

13  ## VIOLATION OF THE WISCONSIN DECEPTIVE TRADE PRACTICES ACT

14  ### (WIS. STAT. § 110.18)

15  479.    Plaintiffs hereby incorporate by reference the allegations contained in the

16  preceding paragraphs of this complaint.

17  480.    This claim is brought by Plaintiffs on behalf of residents of Wisconsin who are

18  members of the Class.

19  481.    The Wisconsin Deceptive Trade Practices Act ("Wisconsin DTPA") prohibits a

20  "representation or statement of fact which is untrue, deceptive or misleading." WIS. STAT.

21  § 100.18(1).

22  482.    Defendant is a "person, firm, corporation or association" within the meaning of

23  WIS. STAT. § 100.18(1).

24  483.    Plaintiffs and class members are members of "the public" within the meaning of

25  WIS. STAT. § 100.18(1).  Plaintiffs purchased EpiPens.

26  484.    Plaintiffs are entitled to damages and other relief provided for under WIS. STAT.



§ 100.18(11)(b)(2).  Because Defendant's conduct was committed knowingly and/or intentionally, Plaintiffs are entitled to treble damages.

485.   Plaintiffs also seek court costs and attorneys' fees under WIS. STAT. § 110.18(11)(b)(2).

## COUNT FIFTY-FIVE

### VIOLATION OF THE WYOMING CONSUMER PROTECTION ACT (WYO. STAT. § 40-12-105 *ET SEQ.*)

486.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

487.   This claim is brought by Plaintiffs on behalf of residents of Wyoming who are members of the Class.

488.   On March 31, 2017, Plaintiffs sent a letter complying with WYO. STAT. § 45-12-109.  If Defendant fails to remedy its unlawful conduct, Plaintiffs will seek all damages and relief to which Plaintiffs are entitled.

489.   Pursuant to applicable state statutes, Plaintiffs will mail a copy of this action to the Attorney General's office for the states of Connecticut, Illinois, Louisiana, Missouri, New Jersey, Oregon, Texas, Utah, and Washington.

## DEMAND FOR JUDGMENT

WHEREFORE, Plaintiffs, on behalf of themselves and the proposed class, respectfully demand that this Court:

A.   Determine that this action may be maintained as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), and direct that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the class, and declare Plaintiffs as the representative of the class;

B.   Enter judgments against Defendant and in favor of Plaintiffs and the class;

C.   Award the class damages (*i.e.*, three times overcharges) in an amount to be determined at trial;



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

1   D.   Award Plaintiffs and the class their costs of suit, including reasonable attorneys'

2   fees as provided by law; and

3   E.   Award such further and additional relief as the case may require and the Court

4   may deem just and proper under the circumstances.

5   **JURY DEMAND**

6   Pursuant to Fed. R. Civ. P. 38, Plaintiffs, on behalf of themselves and the proposed class,

7   demand a trial by jury on all issues so triable.

8

9   Dated:  April 3, 2017                    Respectfully submitted,

10                                           s/ Steve W. Berman
                                             Steve W. Berman, WSBA #12536
11                                           HAGENS BERMAN SOBOL SHAPIRO LLP
                                             1918 Eighth Avenue, Suite 3300
12                                           Seattle, WA  98101
                                             Telephone:  (206) 623-7292
13                                           Facsimile:  (206) 623-0594
                                             steve@hbsslaw.com

14                                           Jennifer Fountain Connolly (*pro hac vice
                                             pending*)
15                                           HAGENS BERMAN SOBOL SHAPIRO LLP
                                             1701 Pennsylvania Ave. NW, Suite 300
16                                           Washington, D.C.  20006
                                             Telephone:  (202) 248-5403
17                                           Facsimile:  (202) 580-6559
                                             jenniferc@hbsslaw.com

18                                           Craig L. Briskin (*pro hac vice pending*)
19                                           MEHRI & SKALET, PLLC
                                             1250 Connecticut Avenue, NW, Suite 300
20                                           Washington, DC  20036
                                             Telephone:  (202) 822-5100
21                                           Cbriskin@Findjustice.com

22                                           *Attorneys for Plaintiffs*

23

24

25

26

27

28

COMPLAINT - 94
Case No.

HAGENS BERMAN

1918 Eighth Avenue, Suite 3300 • Seattle, WA  98101
(206) 623-7292 • FAX (206) 623-0594